Bertram Harnett, J.
We have a zoning case involving a “ center ” for drug problems of young people conducted at the Christ Episcopal Church Parish House in Manhasset by arrangement with Long Island Jewish Hospital.
Neighbors object to the drug center, claiming that under existing zoning the church’s right to use its property is for religious uses only and there is no right to have a drug center. They further argue that even if the drug center is a religious use, it is, under the circumstances, dangerous and unhealthful and cannot be tolerated.
The neighbors have brought suit against the church and the hospital to enjoin the drug center use. The church and the hospital move here for summary judgment in that injunction action and, in turn, the neighbors cross-move for summary judgment themselves. Technically, such motions made before joinder of issue are deemed motions to dismiss the complaint, but may be treated on appropriate papers as motions for summary judgment. (See CPLR 3211, subd. [c]; 3212.)
Earlier, the activity was referred to as a drug ‘1 rehabilitation ” center. Now it is called a “ day care center”. The neighbors pointedly suggest that the new nomenclature is con *313 cerned less with accuracy than with coming under the label of the child care unit for working mothers recently ruled a church use in Matter of Unitarian Universalist Church v. Shorten (63 Misc 2d 978) by Mr. Justice Meyer here in Nassau County. But, no matter how aggravating to those opposing or balming to those proposing, the niceties of characterization are not particularly significant.. The realities of existence must control, and for this purpose the court will characterize the activity simply as “ the drug center ”, and look to the actual incidents.
The church is located at the intersection of Northern Boulevard and Piándome Road in the unincorporated Manhasset area of the Town of North Hempstead. Both roads, particularly Northern Boulevard, an east-west State road, are heavily traveled. A chapel building, a parish house, and other structures occupy the church property which is in a Residence B District zoning category under the Town of North Hempstead Building Ordinance. This classification authorizes churches or other buildings used exclusively for religious purposes, and also specifies the permissibility of parish houses and parochial schools.
The parish house provides about 3,000 square feet for a class meeting and music rooms, as well as a gymnasium, kitchen, and bowling alley. The drug center is located on the third floor of the parish house. On the submission date of this motion, 23 participants were accepted in the program. Eight live in Manhasset, the balance in surrounding communities. Thirteen are to be full-time attendees and 10 will attend after their regular school day. All range between ages 13 and 21. It is not known how many, if any, are church members. While it is not clear how many participants are now actually in attendance, it seems agreed there are at least two.
The drug center program is designed to reach nonaddicted youngsters in early stages of experimentation with marijuana and so-called “ soft ” drugs. Addicts, users of “ hard ” drugs, and prolonged drug users are to be excluded. There is no residential facility, nor are any medications or drugs for detoxification, withdrawal, or maintenance to be provided. The effort is to help the troubled drug abusers find their way early while still functioning acceptably at home and in society. Participation of their parents is to be encouraged.
A paid staff of social, medical, nursing, psychiatric, educational, and vocational counseling personnel will be maintained. The entire project will be financed, staffed, and supervised by the hospital. The church minister will be in daily contact with the staff and program participants.
*314 Activities will include organizational meetings, work therapy, schooling, seminars, reality confrontation groups, drug education, and both individual and group counseling of educational, vocational, individual, and-family matters. Hours are planned from 9:00 a.m. to 9:00 p.m.
Applicants are to be screened and referrals will be accepted from community groups, hospitals, doctors, schools, religious institutions, social agencies, and private. individuals. Certain security measures have been undertaken.
Literature and considerable public attention have been focused on the project.
The geographic vicinity is very busy. It is in a sense a hub of activity, a principal gateway to Manhassett, at the western end of the Manhasset “ Miracle Mile ” shopping area. The church itself sits in a cluster of religious institutions which extend out to major commercial street frontage. Many nearby residences wrap around the area. Diagonally across Northern Boulevard from Christ Episcopal Church are St. Mary’s Church and its schools with a student population of 2,200. The Manhasset Public Library is nearby, as is public transportation.
There is the factual setting. The legal problems organize into three principal inquiries.
(i) Do the neighbors have standing to sue?
(ii) Is the drug center a religious use?
(iii) If the drug center is a religious use, is it so dangerous or unhealthful to the public that it cannot be permitted?
I. Standing to Sue
It is clear that an action may be maintained by a municipality itself to enjoin a violation of its zoning laws. (See Town Law, § 268 ; Town of Greenburgh v. Buser, 285 App. Div. 1090.) The authority to enforce the ordinances may be delegated to a building official or inspector (Willets v. Quinto, 225 N. Y. S. 2d 301), and this has been done by the Town of North Hempstead. (See Matter of Slevin v. Siegel, 65 Misc 2d 3.)
But where, after a written request by a resident taxpayer, the appropriate board or officer has not taken action to enforce the ordinance, any three taxpayers of the town may institute an action to enjoin the alleged violation. (Town Law, § 268, subd. 2 ; Monsey Mfg. Co. v. Ocko, 14 A D 2d 925, reconsidered on other grounds 16 A D 2d 958, revd. on other grounds 13 N Y 2d 623.) It is undisputed here that the neighbors have properly requested the town officials to take steps to enforce the ordinance and that those officials have refused or neglected to do so. The *315 neighbors are therefore proper parties to maintain this action and they have standing to sue.
Moreover, the neighbors would have the requisite standing, assuming the allegations of the complaint to be true, even had they not requested the town to enforce the ordinance. (See Lesron Junior v. Feinberg, 13 A D 2d 90 ; Rapasadi v. Phillips, 2 A D 2d 451.) In order to maintain an action for injunctive relief, a plaintiff must show that he has a special interest which will be substantially damaged by the use which he seeks to enjoin. (Barnathan v. Garden City Park Water Dist., 21 A D 2d 832 ; Meadows v. Binkowski, 50 Misc 2d 19, affd. 27 A D 2d 706.) Here, the plaintiffs have alleged such damage, and their averments are taken as true on this motion, especially in the absence of statement to the contrary in the moving papers. (Kober v. Kober, 16 N Y 2d 191.)
Finally, part of the allegation of the case is public danger in the neighborhood, and the face of the papers does not require a conclusion that the articulated concern is unreasonable or specious. Regardless of technicalities of property law, citizens must have reasonable access to the courts in public controversy which directly involves them and evokes intense interest, fear, and uncertainty. A regulatory question of impact not only to the parties, but to their immediate community is fairly and reasonably posed, and for the court to turn its back on it would be to separate the court from the realities which justify its institution.
H. Religious Use
The United States Constitution and numerous cases spell out the primacy in principle of religious over local zoning considerations. (U. S. Const., 1st Amdt.; N. Y. Const., art. I, § 3 ; Matter of Community Synagogue v. Bates, 1 N Y 2d 445. See, also, 2 Anderson, American Law of Zoning, § 9.18 ; Brindel, Zoning Out Religious Institutions, 32 Notre Dame L. Rev. 627 [1957].) Religious uses of property are considered unique contributions to the public welfare. (Matter of Westchester Reform Temple v. Brown, 22 N Y 2d 488 ; Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton, 1 N Y 2d 508.)
It is not disputed here that the church is properly located in the neighborhood. The zoning concededly permits religious use of the property. The question is whether the drug center is a religious use.
The definition of ‘ ‘ religious use ’ ’ is, however, not a simple one to reach in all cases. The parties agree that one parameter *316 of the definition is that religious usage is not limited to actual prayer or worship services, and they would agree as a far parameter that the operation of a country club, for instance, cannot be considered a valid religious activity. (Matter of Community Synagogue v. Bates, supra.) But, these are extremes of foreseeable conduct, and the majority of contested issues must fall somewhere in between. Where is the line to be drawn? Is it here?
The term “ religious use ” is defined, for zoning purposes, as ‘ ‘ broadly extended to conduct with a religious purpose ’ ’. (67 N. Y. Jur ; Zoning and Planning Laws, § 198 ; Matter of Community Synagogue v. Bates, supra.) The term includes “ guidance of indoor and outdoor activities, for youth and community work” (Matter of Community Synagogue v. Bates, supra, p. 448) ; “school; meeting room; kindergarten, small games, open field and hard-top play areas ” (Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton, supra, p. 516) ; “gymnasium” (Shaffer v. Temple Beth Emeth, 198 App. Div. 607, 609 ; Matter of Temple Israel of Lawrence v. Plaut, 10 Misc 2d 1084) ; “ teaching of secular subjects ” (Westbury Hebrew Congregation v. Downer, 59 Misc 2d 387, 388) ; “meetings of the Boy Scouts and Girl Scouts ” (Matter of Garden City Jewish Center, 157 N. Y. S. 2d 435, 438) ; a religious correspondence school, including necessary publishing machinery (Matter of Faith For Today v. Murdock, 11 A D 2d 718, affd. 9 N Y 2d 761) ; and a children’s, day care center for working mothers in disadvantaged circumstances (Matter of Unitarian Universalist Church v. Shorten, 63 Misc 2d 978, supra). Courts in other States have interpreted the phrase to include a rabbi’s office (Overbrook Farms Club v. Zoning Bd., 351 Pa. 77); a coffee house for college students (Synod of Chesapeake, Inc. v. City of Newark, 254 A. 2d 611 [Del.] ; a gymnasium and outdoor amphitheatre (Keeling v. Board of Zoning Appeals, 117 Ind. App. 314), and a lighted ball field (Corporation of Presiding Bishop v. Ashton, 92 Idaho 571). Christ Episcopal Church itself maintains recreational facilities on its very premises without apparent objection.
In short, the scope of judicial definition of “ religious use ” has been so broad that one authority has stated that: “ [i]f there are limits upon the extent to which the residential character of a neighborhood can be destroyed by a religious user * * * they are not apparent in [Application of Faith For Today, Inc., 11 A D 2d 718, affd. 9 N Y 2d 761] which reached the [New York] Court of Appeals ”. 2 Anderson, American Law of *317 Zoning, § 9.25. (See, 1 Rathkopf, Law of Zoning and Planning, pp. 19-22.) Yet, as the Court of Appeals has said of this area, ‘ ‘ each case ultimately rests upon its own facts ’ ’. (Matter of Community Synagogue v. Bates, 1 N Y 2d 445, 453, supra.)
In the view of the court, the challenges of drugs to the human mind and spirit can be fairly met by the moving thrust of religious institutions. Indeed, the essential moral alienation of drug abuse seems most directly a religious problem. There is implicit in drug abuse a breakdown of spiritual and moral value. The accord of the soul involves in some material part the reaching of an understanding of one with his world. People must relate not only to each other, and must cope not only with the personal and material problems which confront them, but they must also deal with the forces of life, both seen and sensed, which press on their being. Religious, philosophical and ethical insight are major disciplines in forging the life terms adjustment. The drug abuser seeks his inner adjustment in extrinsic aids and brings himself to a whole morass of physical self-destruction and criminality, edging to his own ultimate mental defeat.
The drug center program seeks to discharge a spiritual duty felt by clergymen and their congregants. The Rt. Rev. Jonathan Gr. Sherman, Episcopal Bishop of Long Island, in an affidavit submitted in support of the church’s motion, declares that the drug center program is ‘ ‘ a specific effort to be obedient to Christ’s command to heal ”. Rev. Frank N. Johnston, Rector of Christ Episcopal Church, states in his supporting affidavit that, ‘ ‘ Few things are more critical to the brotherhood of man and the religious activity of a Church than assisting, in every way possible, to bring community youngsters to maturity as healthy, responsible, contributing members of the community ’ ’.
Nor are the stated views of the Long Island clergymen unique, or a departure from prevalent religious attitudes. Even a cursory review of the 1970 files of the New York Times, the prominent daily newspaper, will reflect the thinking of representative religious groups. The president of the Rabbinical Council of America was quoted on April 3, 1970 (p. 61, col. 4) as saying that the drug problem ‘ ‘ revolves around the religious and spiritual aspects of our civilization ’ ’ and is representative of a “ malaise in spirit and an emptiness in soul which finds its symptomatic expression in the bizarre and exotic”. The General Assembly of the United Presbyterian Church takes the position (May 23, 1970, p. 15, col. 3) that drug use should he treated as a social problem. The Greek Orthodox Archdiocese of *318 North and South American Clergy-Laity Congress is reported (July 5, 1970, p. 24, col. 4) as declaring that its deeper involvement in social problems is necessary, including problems of drug abuse.
Pope Paul VI is quoted on October 20, 1970 (p. 4, col. 3) as saying that priests must approach drug addicts ‘ ‘ particularly young ones, attempting to restore to them, with God’s help, free and responsible self-control ’ ’.
A testament to the widely-held lay view that drug problems and religion relate is the New York Times quotation attributed to the President of the United States, ‘ ‘ In the final analysis, if there is an answer to the drug problem (the clergymen) have it ” (March 27, 1971, p. 34, col. 2).
In “Drug Abuse in Suburbia, An Interim Report of the Nassau County Probation Department’s Continuing Research Study of Drug Abuse in Nassau County, New York”, p. 6, (March 1,1969), it is said: “ There is little doubt, however, that religion and the churches, representing as they do one of the major community institutions, should play a significant role in the socialization of the young and also in combating present day social problems such as drug abuse ’ ’.
The court believes that the drug center is a religious use of the church property and a valid extension of the religious institution for zoning purposes. The court is not persuaded by the neighbors ’ last line of attack on religious usage that the religious uses must be conducted by the church itself for the benefit of its own members. First of all, the legal authorities suggest a contrary proposition. (See Westbury Hebrew Congregation v. Downer, 59 Misc 2d 387, by Mr. Justice Pittoni in Nassau County ; cf. Matter of Diocese of Cent. N. Y. v. Schwarzer, 23 Misc 2d 515, affd. 13 A D 2d 863.) In Matter of Unitarian Universalist Church v. Shorten (63 Misc 2d 978, supra) relied on by the neighbors, those to be benefited were not members of the church involved, nor was it even plain that the church was really involved in the mechanical operation of the affiliated entity responsible for the day care center. Second, the argument offends the sense of the situation.
If a use of church property is a religious use, why should it matter that those of other religions or beliefs will benefit, or that the church engages or contracts or permits specialists or professional people on its premises to execute the religious use? The thought of limiting benefit struggles against the strong modern current of pan-ecumenicalism, and furstrates the desirable mutual interchange of use of religious institutions in our society *319 today, ranging from bingo, to scout meetings, to lectures, to community action programs, to interfaitb. programs. The fact that the hospital supplies funds accords with the fact that religious funds are typically contributed.
The argument of separation overlooks entirely the daily association of the minister with the drug center staff and participants, and the churQh consultation and counseling. The neighbors fail to take into account the regulation effected by the church through its houskeeping function of the premises, and its ability to affect the drug center not only with its moral and informative force, but also with its legal power over the center’s occupancy.
Is not the helping hand to others who have lost their way basic to divine tradition? And cannot the ministry and congregants of the church contribute their substance to this end and find contentment in their giving?
The neighbors’ attempt to portray the hospital as a mere third-party tenant occupying part of the church property, and the church as a type of neutral landlord, in a transaction indifferent to religious implication, is simply untenable.
III. Public Danger
The parties agree that drug abuse is a major public concern of our time. They quite agree that the policy of the State of New York is to encourage alleviation of drug problems, although no statute pre-empting local zoning power in its favor was cited.
The neighbors simply argue that, even assuming the drug center is a valid religious usage in discharge of a legitimate public objective, that the place chosen is a wrong one. They claim essentially that the proximity of the drug center to schools, the public library, and numerous residences, a large population of potentially susceptible young people, creates a community hazard. There is an apparent concern for the entry of the drug center participants into the existing environment.
If there is a genuine danger to the community, if an unreasonably unhealthful element is in fact introduced, the factor of religiosity alone cannot grant a legal immunity.
It is true that where an irreconcilable conflict exists between the right to erect a religious structure and the potential hazards of traffic or diminution in value, the latter must yield to the religious use. (Matter of Westchester Reform Temple v. Brown, 22 N Y 2d 488, supra.) This is because in the weighing process such potential hazards as traffic, decreased value and decreased *320 enjoyment cannot justify the exclusion of religious structures which have a constitutionally protected status. Religious freedoms rise above mere property rights, public inconvenience, annoyance and unrest. (Matter of Garden City Jewish Center v. Incorporated Vil. of Garden City, 2 Misc 2d 1009.)
However, there can be a denial of use where the court is convinced that proposed uses will increase community hazards to the point of real personal danger. (West Hartford Methodist Church v. Zoning Bd. of Appeals, 143 Conn. 263 ; Milwaukee Co. of Jehovah’s Witnesses v. Mullen, 214 Ore. 281, cert. den. 359 U. S. 436.)
Where the religious use may be so fraught with danger or peril to the community because of the particular use sought, the detriment to the community can outweigh the religious consideration. For instance, dynamite or contagion carry different weights than nuisance or financial loss. As stated in Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton (1 N Y 2d 508, supra) the matter turns on a “ substantial relation to the health, safety, morals, or general welfare of the community ’ ’. The net of this authority is that while religious uses cannot be excluded, the religious uses are nonetheless subject to reasonable regulation weighed in relation to the total safety, health and morals of the community. (See Holy Sepulchre Cemetery v. Town of Greece, 191 Misc. 241, affd. 273 App. Div. 942 ; cf. Pelham Jewish Center v. Marsh, 10 A D 2d 645 ; Matter of Garden City Jewish Center v. Incorporated Vil. of Garden City, 2 Misc 2d 1009.)
Whether a use poses annoyance or financial inconvenience (which must fall to a legally superior religious privilege), or whether it offers unreasonable dangers to a community (which justifies restraint and protection of the community) depends in material part on determinations of fact. In this case, the facts are not entirely clear. Wliile the nature of the use is piercingly plain, the impact on the community is not.
The neighbors claim the aggregation in the community of the drug center participants will promote the use of drugs, will increase the available sources of sale of drugs, and will attract innocent youngsters to drug experimentation. They also express fear about increases in crime.
Actually, the church and the hospital have recognized certain dangers, whether as a sop to the community, or as a matter of conviction, and have provided for security measures. These involve attendance scrutiny, close supervision, geographic restrictions, urine testing, meals at the center, and regular police survey.
*321 The issue is before the court now on a motion for summary judgment, which presumes the truth of the facts averred by the party defending the motion. (Kober v. Kober, 16 N Y 2d 191, supra.) Both on the motion and cross motion for summary judgment there appear material issues of fact which must be determined on the trial of the injunction action itself. These issues include statistics and expert testimony with respect to real and potential expansion of crime and drug use in the immediate vicinity, the actual implementation of security measures, the experience of comparable facilities, the numbers, nature, flow, and habits of the nearby student population, and any other facts bearing on the issue of public safety. Accordingly, the court leaves the determination of the issues of public danger to the trial in accordance with the principles of this opinion.
IV. Conclusion
Based upon the considerations set forth above, this court rules as follows:
(a) The plaintiffs have standing to sue.
(b) Partial summary judgment will be granted to the defendants to the extent that the drug center use will be deemed a religious use within the Building Zone Ordinance of the Town of North Hempstead. (See CPLR 3212, subd. [e].)
(c) In other respects, and particularly with respect to the issue ' as to whether the drug center presents such a danger to the public health and safety to the community as would require its discontinuance, the defendants’ motion is denied and the matter is to be put before the trial court for determinations of fact. (CPLR 3212, subd. [e].) The matter will be placed at the head of the May Term calendar of Special Term, Part III, subject to the Justice then presiding.
(d) The plaintiffs’ motion for summary judgment is in all respects denied.