THE BIBLE SPEAKS *vs.* BOARD OF APPEALS OF LENOX
(and four companion cases[1]).

Berkshire.    April 25, 1979. — July 3, 1979.

Present: ARMSTRONG, GREANEY, & KASS, JJ.

*Zoning,* Validity, Educational institution, Special permit, Religious
institution.

A nonprofit religious and educational corporation was not exempt by
reason of St. 1975, c. 808, § 6, from a town's application of restric-
tions adopted under G. L. c. 40A, § 3, which permits educational
"land or structures [to] be subject to reasonable regulations con-
cerning the bulk and height of structures and determining yard
sizes, lot area, setbacks, open space, parking and building coverage
requirements." [26-30]
The provisions of a town's by-law which required every nonmunicipal
educational institution planning any change in its buildings and
structures to file with the board of appeals a site plan and informa-
tional statement designed "to minimize the probable impact of such
uses upon the town in general and upon the character of the specific
neighborhood" and which made educational uses special exceptions
dependent on the discretionary grant of a special permit by the
board were beyond the scope of regulations permitted to be imposed
on educational uses by G. L. c. 40A, § 3. [30-34]
Portions of a town's zoning by-law which imposed bulk, dimensional,
and parking restrictions on educational uses and which were valid
as the type of reasonable regulations authorized by G. L. c. 40A, § 3,
were severable from other portions of the section which were be-
yond the scope of regulations permitted under § 3. [34]

CIVIL ACTIONS commenced in the Superior Court, one
on October 22, 1976, two on May 31, 1977, and two on
September 13, 1977.

---

[1] Two of the companion cases are also against the board of appeals,
and two are against the building inspector of Lenox.

The cases were heard by *George,* J., a District Court judge sitting under statutory authority.

*Hugh C. Cowhig,* Town Counsel (*David O. Burbank* with him) for the defendants.

*Andrew T. Campoli,* for the plaintiff, submitted a brief.

GREANEY, J. These appeals raise the question whether a town may require an application for a special permit for all new religious and educational uses, or changes in such uses, in residential districts consistent with the provisions of G. L. c. 40A, § 3, as appearing in St. 1975, c. 808, § 3.[2] Specifically, we must decide whether the plaintiff, a sectarian educational institution, should have been granted building permits for certain uses attendant to its softball field, which is utilized by its elementary, high school, and college students, without the necessity of first applying under the local by-law for a special permit. We must also determine whether the Lenox board of appeals (board) could properly have conditioned the grant of permission to change the use of three of the plaintiff's existing buildings into classroom and dormitory space, either upon restrictions that affect the entire educational campus or upon restrictions that concern buildings which are not the subject of the special permit applications. All of these questions require examination of the extent to which a municipality by way of its zoning by-law may regulate sectarian and nonsectarian educational uses, a question that has remained relatively dormant since the decision in *Radcliffe College* v. *Cambridge,* 350 Mass. 613 (1966).

---

[2] That section provides in relevant part that "[n]o zoning ordinance or by-law shall . . . regulate or restrict the use of land or structures for religious purposes or for educational purposes on land owned or leased . . . by a religious sect or denomination, or by a nonprofit educational corporation; provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements."

We first summarize the facts and procedural history necessary to an understanding of these issues. The Bible Speaks is a non-profit religious and educational corporation organized under the laws of the State of Maine which has filed a certificate as a foreign corporation doing business in the Commonwealth under the provisions of G. L. c. 181, § 4.[3] On its campus in Lenox (formerly the property of a private nonsectarian educational institution) it conducts a school for grades kindergarten through twelve (approved by the Lenox School Committee pursuant to the provisions of G. L. c. 76, § 1) and a three-year college to prepare students for the ministry.[4] On May 7, 1976, the town of Lenox (town) at its annual town meeting accepted the provisions of the new zoning enabling act, St. 1975, c. 808 (hereinafter c. 808). At the same meeting the town amended its zoning by-law to include a section covering "Educational/Religious Use"[5] which imposed a limita-

---

[3] The parties stipulated that The Bible Speaks was organized on February 21, 1973, under Me. Rev. Stat. Ann. tit. 13, § 71 (1965); that it was certified as a foreign corporation by the Secretary of the Commonwealth on March 8, 1976; and that in 1976 it received a certificate of exemption under G. L. c. 64H, §§ 6(d) and (e), from the Sales and Use Tax Bureau.

[4] There appears to be no dispute that it conducts on its campus a bona fide educational enterprise.

[5] Section 9.18 of the zoning by-law ("Educational/Religious Use") provides as follows:

"Any non-municipal educational use or any religious use is subject to the following regulations: recognizing that educational and religious uses may exist in residential areas, the following regulations are drawn to minimize the probable impact of such uses upon the town in general and upon the character of the specific neighborhood. In order to assess the probable impact, a site plan and informational statement must be presented to the permit-granting authority at the time of the initial filing. The site plan at a scale of 1″ = 40′, prepared by a registered architect, landscape architect, or civil engineer, must show existing buildings, roads, parking areas, sewer and water lines, drainage systems, water courses, trees over 12″ in diameter at breast height, and any other significant existing man-made or natural features.

"The informational statement shall detail the probable effects of the use on the following: (1) attendance at public schools; (2) increase in

tion that all educational and religious purposes "may be permitted as a special exception only if the [board] so determines."[6] On July 23, 1976, the plaintiff applied to the board for a special permit to change the use of one of its buildings from a gymnasium to two classrooms for its college; on August 3, 1976, it further sought to change the use of two other buildings from classrooms and a chapel to small dormitories. On October 15, 1976, the board granted all three special permits, subject to the condi-

---

vehicular traffic; (3) changes in the number of legal residents; (4) increases in municipal service costs; (5) load on public utilities or future demand for them; (6) public safety, police, and fire protection; (7) changes in tax revenue; (8) changes in surface drainage; (9) increased consumption of water; (10) increased refuse disposal; (11) land erosion or loss of tree cover; (12) character of surrounding neighborhood; (13) master plan of the town; (14) any pertinent regional plans."

"Any non-municipal educational use or any religious use is subject to the following regulations:

REGULATIONS

1. Maximum building height — 2 stories or 35 feet.
2. Maximum building coverage — 4%.
3. Setback — two hundred (200) feet buffer surrounding the property to be kept undeveloped except for entrance and exit roadways.
4. Major access roads and major parking areas subject to frequent use day or night shall be paved. Major roads are to be eighteen (18) feet wide and shall not exceed a 7½% grade.
5. Parking areas shall be screened as provided in Section 2 — definitions — screening — (a) and (c).
6. Parking areas shall be within three hundred (300) feet of the building to be served.
7. Parking requirements:
    A. Places of assembly — 1 space for every three (3) seats.
    B. Classrooms and/or dormitories —
        Grades 1-10 — 1 space for each staff member;
        Grades 10-12 — 1 space for each staff member plus
        1 space for every two students.
        College — 1 space for each staff member plus two (2)
        spaces for every three (3) students."

[6] Section 6 of the zoning by-law of the town of Lenox (as amended 1976). This limitation was accomplished by amending the table of uses in § 6 of the by-law to indicate that educational or religious purposes in residential districts are "xa" uses, permitted only by special exception, as contrasted with "x" uses, which are permitted as of right.

The Bible Speaks v. Board of Appeals of Lenox.

tions set out in full in the margin.[7] The board went on to state in its decisions that "[t]he petitioner has complied with the first two paragraphs of section 9.18 by filing" plans and information concerning the total operation of its campus as part of the applications for special permits for changes in use of the three existing buildings. The plaintiff filed a timely action in the Superior Court seeking review of the decisions and specifically objecting to the four general conditions (conditions 4A, B, C & D in the board's decision, note 7, *supra*) upon which the special

---

[7]                                                      "Oct. 15, 1976
"Decision of the Board of Appeals on the appeal and petitions of the Bible Speaks for

I. A change in the use of Building No. I, The Old Gymnasium, to two classrooms and a lecture hall.

2. A change in the use of Building No. 15, formerly Bassett Hall, from classrooms to dormitory rooms.

3. A change in the use of Building No. 12, formerly Thayer Hall, from chapel and storage space to five dormitory rooms."

"Special permits are granted for each of these three petitions, subject to the following restrictions:

I. Building No. I, The Old Gymnasium –
    A. The use and occupancy of this building is limited to 300 persons.

2. Building No. 15, formerly Bassett Hall –
    A. The occupancy of this building is limited to 13 couples and their children.
    B. There shall be no kitchen facilities provided and meals shall not be served on the premises except in an emergency.

3. Building No. 12, formerly Thayer Hall –
    A. The occupancy of this building is limited to 3 couples and 10 single students.
    B. There shall be no kitchen facilities provided and meals shall not be served on the premises except in an emergency.

4. The following restrictions apply to all three special permits:
    A. Sufficient parking spaces are to be provided and screened to meet the requirements of the Zoning By-Laws, Section 9.18; Regulations 4, 5, 6, and 7. Reference is made to the parking site plan filed with the board.
    B. The total number of students and staff living at the 40 Kemble Street facilities is limited to 325.
    C. Any major differences in enrollment, residents, buildings, campus, or plans from those outlined in the master plan, drawings or informational statement presented to the Planning Board, dated June 16, 1976, shall be brought to the attention of the Planning Board and Zoning Board of Appeals immediately.

permits were granted in all three change-of-use cases.

On May 25, 1977, the plaintiff applied to the building inspector for a building permit to erect hooded lights thirty-five feet high[8] on a softball field which is part of its campus. The building inspector refused to grant the permit. On the same date, the plaintiff requested a building permit to convert an existing shed near its ballfield into a snack bar primarily for the benefit of its students and others using the field. This request was also denied. The plaintiff appealed from both actions of the building inspector to the board. On August 29, 1977, the board issued separate decisions on the two appeals which are reproduced, insofar as material, in the margin,[9] upholding the

---

D. A sewer holding tank is to be constructed to collect the flow from Buildings No. 4 (St. Martin's Hall), No. 19 (Monks Hall) and No. 20 (Field House) during periods of high sewage flow and to release the sewage into the Town mains during periods of low volume flow. The capacity of this tank is to be determined by a licensed and certified engineer of the Tri-Town Sanitary Engineer."

Other portions of the decision express the board's opinion that the proposed use of Building No. I [*sic*] as a dormitory for thirteen married couples is "marginal from the standpoint of the zoning by-laws, as it makes the use of the building very close to apartments," but that the uses are "not deemed to be detrimental to the area or the community, subject to the restrictions and qualifications in this decision."

[8] Section 7.6.2 of the zoning by-law states that "[i]n all zoning districts, any private outdoor lighting fixture, whether temporary or permanent, shall be so placed or hooded that the light shall not be noxious or offensive to the neighborhood," while § 8.4.5 provides that the maximum building or structure height in all districts is thirty-five feet.

[9] "Decision

"The appeal of the Bible Speaks, 40 Kemble Street, from the refusal of the Building Inspector to issue them a permit for the erection of hooded lights at 35 ft. in height around their softball field, located in an area near Stockbridge Road, is *denied.*

"The Zoning Bylaws, as amended May 7, 1976 stipulate that changes in religious and educational uses require a specific permit in all zoning districts. It is the Board's opinion that the change from an unlighted softball field to one that is lighted, specifically for the purpose of extending the playing hours into the night, would constitute a significant change in use and therefore would require a special permit.

building inspector's denial of building permits on the bases that a change in a religious or educational use required application for a special permit and that the operation of the softball field at night was not "reasonably necessary for the functioning of the religious or educational uses." The plaintiff brought separate complaints against the building inspector and the board in both the snack bar and lights cases testing the validity of these actions.

Those actions were consolidated for trial along with the pending complaints involving the three change-of-use cases. A District Court judge sitting in the Superior Court under statutory authority ruled: (1) that the board had no authority to grant or deny the permit for the snack bar (as a consequence he ordered the board to refrain from interfering with the operation of the plaintiff's snack bar); (2) that the denial of a permit to erect the lights was

---

"The petitioner's point that the lighting of this softball field is an adjunct to the operation of its school was not proven. The lights are clearly meant for nighttime use and the petitioner has stated that they will be used to extend the hours of play for the regional softball league (of which the Bible Speaks is a member). The operation of such lights is not considered to be reasonably necessary for the functioning of the religious or educational uses."

"Decision

"The appeal of the Bible Speaks, 40 Kemble Street, from the refusal of the Building Inspector to issue to them a permit to open a snack bar near their softball field is *denied.*

"The Zoning Bylaws, as amended May 7, 1976 stipulate that changes in religious and educational uses require a special permit in all districts, (See Bylaw Sections 6.3 and 6.6B). It is the Board's opinion that the change from a storage shed (as indicated in their master plan) to a vending operation would constitute a change in use significant enough to require a special permit.

"Zoning Bylaw Section 9.18 on religious & Educational Uses requires that such an organization file a site plan and an informational statement with the Zoning Board of Appeals when it initially files a petition. The Bible Speaks filed such a site plan and informational statement on or about June 16, 1976. In these papers the old use of the building in question (Identified as No. 22 Boat House) was for storage . . . ."

within the power of the board (as a result he affirmed the decision of the board); and (3) that the specific conditions imposed on the special permits for change of use of the three existing buildings were valid, as restatements of the substance of the plaintiff's applications, but that the remaining four general restrictions were attempts to impose limitations on the plaintiff's general educational activities and, as such, exceeded the authority of the board (as a result he ordered these conditions annulled). Judgments were entered accordingly. The board and the building inspector took appeals from the judgments in the snack bar cases; the board also appeals from the judgment in the change-of-use cases, and the plaintiff appeals from the judgment in the lights cases.

In substance, we are content with the judge's rulings that the plaintiff may utilize its existing shed as a snack bar and that the board exceeded its authority in imposing general restrictions upon the plaintiff as preconditions to a change of use of its buildings. We disagree with the judge's conclusion that the board's decision as to the softball field lights was proper. Our disposition of the issues follows a different route from that taken by the judge below and is based on the conclusion that the local by-law exceeds tolerably permissible limits in its regulation of educational uses.

1. *Applicability of G. L. c. 40A.* At the outset we consider the plaintiff's contention that it is entirely exempt from the effect of The Zoning Enabling Act, G. L. c. 40A, as formulated through c. 808, and as a result, that it is also exempt from any local zoning requirements enacted pursuant to c. 40A. It bases this contention in part upon the language which appears in c. 808, § 6, which provides, insofar as material, that "[t]he provisions of [G. L. c. 40A], as amended . . . shall not be deemed to affect any church or other facilities used for religious purposes in existence or under construction prior to [June 30, 1978]." It claims that the provisions of § 6 are designed to continue in effect the prior versions of G. L. c. 40A, which exempted

religious and educational uses from zoning control under local by-laws.[10] In further support of this argument the plaintiff directs our attention to cases elsewhere which it cites as persuasive authority for the proposition that uses analogous to those present on its campus are primarily religious uses, exempt from any form of local zoning control. These decisions are four in number: *Bishop* v. *Ash-*

---

[10] The history of the special zoning status for religious and educational uses is familiar lore to those conversant with the topic of land use regulation and may be summarized as follows. In 1933, the town of Dover adopted a zoning by-law prohibiting the erection, alteration, or use of any building or premises in a residential district for any purpose except enumerated purposes which, in addition to "1. detached one-family dwellings," included "3. church," and "4. educational use." On March 4, 1946, this by-law was amended in subdivision 4, so that the subdivision read, "4. educational use; if non-sectarian and if not organized or operated for private profit." In 1950, St. 1950, c. 325, inserted the following language in G. L. c. 40, § 25, a predecessor of the present c. 40A, § 3: "No by-law or ordinance which prohibits or limits the use of land for any church or other religious purpose or which prohibits or limits the use of land for any religious, sectarian or denominational educational purpose shall be valid." In *Attorney General* v. *Dover*, 327 Mass. 601 (1951), the Supreme Judicial Court was called upon to consider the impact of this amendment (which is widely referred to as the Dover Amendment) on the Dover by-law. The court stated that the effect of the by-law, if valid, "would be to prohibit any use of land or buildings in a residential district for sectarian educational purposes" and agreed with the Attorney General's contention that "if the amended [by-law] was ever valid, it became invalid immediately upon the taking effect of the statute of 1950." *Id.* at 603-604. In *Sisters of the Holy Cross* v. *Brookline*, 347 Mass. 486 (1964), the court struck down the application of single family residence dimensional requirements to a sectarian educational institution as having the effect of virtually nullifying the Dover Amendment, though stating in dicta that there might be instances in which a municipality might permissibly impose dimensional requirements upon buildings that serve educational or religious purposes. In *Radcliffe College* v. *Cambridge*, 350 Mass. 613 (1966), the court refused to construe the Dover Amendment as precluding the application of offstreet parking requirements contained in the Cambridge zoning ordinance to the plaintiff, ruling that the ordinance did not impede the reasonable use of the college's land for its educational purposes. Two other cases deal with peripheral aspects of the topic. See *Worcester* v. *New England Inst. & New England Sch. of Accounting, Inc.*, 335 Mass. 486 (1957); *Chicopee* v. *Jakubowski*, 348 Mass. 230 (1964).

*ton,* 92 Idaho 571, 574-575 (1968), which held that a recreational complex built by a religious organization on the same grounds as its church building was within the scope of the term "church" in an ordinance permitting church use in a residential zone; *Slevin* v. *Long Island Jewish Medical Center,* 66 Misc. 2d 312, 317-319 (N.Y. Sup. Ct. 1971), which determined that a drug rehabilitation center located in a church parish house was a religious use; *Diocese of Rochester* v. *Planning Bd. of Brighton,* 1 N.Y. 2d 508, 522-526 (1956), which concluded that the decision of a local zoning board denying a permit to erect a church and a parochial school in a residential zone was arbitrary and unreasonable, because a church could not be unreasonably excluded from a residential zone, and a parochial school was to be permitted wherever public schools were allowed; and *State ex rel. Covenant Harbor Bible Camp* v. *Steinke,* 7 Wis. 2d 275, 281 (1959), which held that a Bible camp constituted a permissible use under an ordinance which authorized "churches ... boarding-and-lodging parochial schools [and] organized quasi-public recreational ... buildings and grounds," and became a nonconforming use upon passage of an amendment deleting these provisions.

The plaintiff's argument, reduced to basics, appears to draw on three premises: (1) that it is primarily a religious enterprise because its principal function is to educate and train people for the ministry; (2) that c. 808, § 6, is the legislative restatement of the Dover Amendment and exempts projects under construction by religious organizations if started prior to June 30, 1978, irrespective of the town's earlier acceptance of c. 808; and (3) that because its oar was in the water on all the proposed activities in issue prior to June 30, 1978, the town could not impose any restrictions on their completion. We are not persuaded by this argument.

The cases relied upon by the plaintiff, read in connection with the provisions of c. 808, § 6, to establish the proposition that religious uses are generally exempted

from any zoning regulation, are all inapposite. The *Bishop* and *Slevin* decisions concerned themselves with proposed accessory uses to existing church facilities and did not involve sectarian educational facilities such as are in issue here. The *Rochester* decision is based on the peculiarities of the local by-law involved in that dispute, while the result in the *Harbor Bible Camp* case turns on the law relating to nonconforming uses.

Moreover, the plaintiff's argument also completely overlooks the presence of G. L. c. 40A, § 3, appearing in c. 808, § 3. This section provides, in pertinent part, that "[n]o zoning ordinance or by-law shall . . . prohibit, regulate or restrict the use of land or structures for religious purposes or for educational purposes on land owned or leased by . . . a religious sect or denomination . . . provided however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements." It is this section, not c. 808, § 6, that is intended to synthesize the Dover amendment and case law construing it (see note 10, *supra*). Section 6 must be viewed as a special nonconforming use provision of limited life to accommodate religious uses which were in the planning stage when c. 808 was enacted and which were likely to be built or under way by June 30, 1978.

Reading §§ 3 and 6 together, in the light of case law, and harmonizing the two sections in view of the purposes they seek to accomplish, we conclude that § 6 was designed to permit exclusively church-like properties to continue projects under construction without encumbrance by local zoning by-laws until June 30, 1978, irrespective of a town's earlier acceptance of c. 808, while § 3 was intended to authorize a town such as Lenox, upon its acceptance of c. 808, to impose the type of regulations described in that section on sectarian educational uses or other religious uses which were not intrinsically accesso-

ry to a church.[11] Considering the uses contemplated by
the plaintiff against the broad definition of the term
"education" fashioned by our case law (see e.g., *Radcliffe
College* v. *Cambridge*, 350 Mass. at 618, holding that park-
ing, and the feeding and housing of college personnel is
"within the broad scope of the educational powers," and
*Harbor Schs. Inc.* v. *Board of Appeals of Haverhill*, 5
Mass. App. Ct. 600, 605 [1977], quoting from *Mount Her-
mon Boys' Sch.* v. *Gill*, 145 Mass. 139, 146 [1887], stating
that "[e]ducation may be particularly directed to either
the mental, moral, or physical powers and faculties, but
in its broadest and best sense it relates to them all"), it
is plain to us that all the plaintiff's proposed uses are
educational in nature, as purposes directly related to the
functioning of the sectarian educational institution
maintained on its Lenox campus. It follows, as a conse-
quence, that the plaintiff is not exempt by reason of
c. 808, § 6, from the town's application of restrictions
adopted under G. L. c. 40A, § 3, which permits education-
al "land or structures [to be] subject to reasonable regula-
tions concerning the bulk and height of structures and
determining yard sizes, lot area, setbacks, open space,
parking and building coverage requirements."

2. *Validity of the Lenox by-law.* By employing the lan-
guage just quoted, the Legislature set out the scope of
permissible regulation of religious and educational land
and structures. In the context of this case, Lenox may,
through the mechanism of its zoning by-law, consistent
with G. L. c. 40A, § 3, regulate the bulk of buildings on the
plaintiff's campus and impose dimensional and parking

[11] A simple example will elucidate the distinctions further. Lenox
accepted c. 808 on May 7, 1976. From that date until June 30, 1978,
a church if it desired could, by virtue of § 6, construct a fifty-foot
steeple despite the imposition of height restrictions in the by-law.
However, if it conducted a college, the church might not be able to
construct a high rise dormitory on its campus by reason of the restric-
tions imposed under the authority of § 3. The two sections serve to
denominate religious and sectarian educational uses as two separate
categories.

requirements; and the building inspector may properly deny the plaintiff permits for any structure which does not comply with such "reasonable regulations." But the town may not, through the guise of regulating bulk and dimensional requirements under the enabling statute, proceed to "nullify" the use exemption permitted to an educational institution. *Sisters of the Holy Cross* v. *Brookline*, 347 Mass. 486, 494 (1964).

We turn then to the question whether §§ 6 and 9.18 of the town's zoning by-law, when taken together, impose the type of permissible bulk, dimensional, and parking limitations specified in G. L. c. 40A, § 3, as the defendants claim, or whether they impermissibly regulate the use of a sectarian educational institution, as the plaintiff claims.

The board points out that § 9.18 of the by-law sets out under a heading of "Regulations," specific limitations of the sort expressly permitted under G. L. c. 40A, § 3 (see note 5, *supra*). There would be no difficulty if these constituted the only limitations which the town applied to educational institutions such as the plaintiff's campus. However, the by-law imposes several other requirements which apply to the plaintiff's educational uses within § 9.18 and § 6. Section 9.18 also requires every non-municipal educational institution planning any change in its buildings and structures to file with the board a site plan and an informational statement designed "to minimize the probable impact of such uses upon the town in general and upon the character of the specific neighborhood." The site plan calls for a delineation of existing buildings, parking areas, sewer and water lines, trees over twelve inches in diameter, "and any other significant existing man-made or natural features"; the informational statement must include "the probable effects of the use on [such factors as] ... changes in the number of legal residents, ... increases in municipal service costs, ... changes in tax revenue, ... land erosion or loss of tree cover, ... character of surrounding neighborhood,

. . . master plan of the town, . . . [or] any pertinent regional plans."[12] The requirement of a site plan and the type of development prospectus required by the informational statement would be perfectly appropriate for consideration of proposed subdivisions under the Subdivision Control Law, G. L. c. 41, § 81K et seq., or for the evaluation of cluster and planned unit developments under the zoning law, G. L. c. 40A, § 9, as appearing in c. 808, § 3. But there is nothing in the language of G. L. c. 40A, § 3, which contemplates the requirement of site plans and informational statements as monitoring devices for educational uses, and it is quite obvious that an educational campus of the type under consideration in this case is neither a subdivision nor a project in the category of a cluster or planned unit development. Section 9.18 in its entirety goes beyond a collation of all of the reasonable bulk and dimensional requirements which a by-law can legitimately impose on educational buildings and districts.

The full impact of the requirements of § 9.18 must also be appraised in light of the provisions of § 6 of the by-law, which makes educational uses, such as the plaintiff's, special exceptions dependent on the discretionary grant of a special permit by the board.[13] By reliance on the criteria spelled out in the informational statement, the board is essentially attempting to exercise planning board functions and pursuing its own notions of land use planning, and to the extent that those notions become inconsistent with the presence or expansion of education-

---

[12] In addition, the "informational statement" also requires the educational institution to include an assessment of the probable impact of its project on attendance in the public schools, increase in vehicular traffic, increases in municipal service costs, load on public utilities or the future demand for them, public safety, police and fire protection, changes in surface drainage, increased consumption of water and increase in refuse disposal.

[13] The special exception provisions of the by-law are set forth in note 6, *supra.*

al institutions within the town, the board will be able to fashion restrictions that subordinate the educational use to the board's planning goals. Any such restrictions imposed under the authority of the by-law may well have the effect of nullifying, or seriously diminishing, the educational institution's entitlement to reasonable growth. The by-law also, as a practical matter, would enable the board to exercise its preferences as to what kind of educational or religious denominations it will welcome, the very kind of restrictive attitude which the Dover Amendment was intended to foreclose. The board's decisions in these cases bear out these observations by indicating that the board applied the by-law to make its own determination of what constituted an educational use, and once that determination was made, to impose conditions in areas outside of those specified in the enabling statute.

In our opinion, the provisions of the by-law taken together invest the board with a considerable measure of discretionary authority over an educational institution's use of its facilities and create a scheme of land use regulation for such institutions which is antithetical to the limitations on municipal zoning power in this area prescribed by G. L. c. 40A, § 3. The Legislature did not intend to impose special permit requirements, designed under c. 40A, § 9, to accommodate uses not permitted as of right in a particular zoning district, on legitimate educational uses which have been expressly authorized to exist as of right in any zone.[14]

We conclude, therefore, that the provisions of the Lenox by-law go well beyond the scope of bulk, dimensional, and parking regulations permitted to be imposed on educational uses by G.L. c. 40A, § 3, and place the board in a position to act, as it did in this case, impermis-

---

[14] The board's argument that G. L. c. 40A, § 9, authorizes a special permit mechanism to afford the town leeway in regulating uses not otherwise permitted as of right in a zone simply overlooks the limitations on the town's zoning power as to religious and educational uses contained in c. 40A, § 3.

sibly to "impede the reasonable use of the [institution's] land for its educational purposes." *Radcliffe College* v. *Cambridge*, 350 Mass. at 618.

3. *Relief.* The question of a proper disposition of the cases remains. The plaintiff's multiple actions are susceptible to consideration as requests for declaratory relief (*Woods* v. *Newton*, 349 Mass. 373, 375 [1965]) and, in reaching a disposition, we consider it appropriate to treat them in that posture. Despite the presumption of validity accorded to municipal zoning ordinances (*Crall* v. *Leominster*, 362 Mass. 95, 102 [1972]), we are satisfied that portions of the Lenox by-law are in conflict with The Zoning Enabling Act. It is also clear to us that those portions of § 9.18 of the by-law which impose bulk, dimensional and parking restrictions on educational uses would be valid as the type of reasonable regulations authorized by G. L. c. 40A, § 3, if they stood apart from the embroidery contained in the provisions of the by-law requiring site plans, information statements, and special permits for educational uses. We determine, however, that the bulk, dimensional, and parking regulations are severable from the balance of § 9.18, and from the provisions in § 6, and are capable of enforcement as if they were limitations applicable to all structures of a particular class, including educational buildings and structures.

The judgments are reversed, and new judgments are to be entered, declaring that § 6 and those portions of § 9.18 of the Lenox zoning by-law which impose the requirements of a site plan, informational statement, and special permit before religious and educational institutions can expand their uses are invalid; that the provisions of § 9.18, imposing bulk, dimensional, and parking requirements are valid; that the plaintiff is not required to apply for a special permit as a condition precedent to obtaining a building permit for the construction of its softball field lights; that the plaintiff is not required to obtain either a special permit or a building permit in order to use its shed as a snack bar; and that the conditions annexed to

the three change-of-use cases (denominated in the decisions dated October 15, 1976, as 4A, 4B, 4C and 4D) are annulled, with the notation that occupancy of the buildings can be conditioned on compliance with the applicable parking requirements in § 9.18.[15]

*So ordered.*

---

[15] Of course, all the proposed uses contemplated by the plaintiff in this case, and in particular the uses intended for the buildings, are subject to the requirements of any other applicable State or local codes such as (without limitation) health and sanitary codes, fire codes and regulations, and the State Building Code.