Billings, A.J.
For the reasons that follow, the plaintiffs motion for summary judgment is DENIED, and the defendants’ cross motion for summary judgment is ALLOWED.
FACTS
The following facts are undisputed on the summary judgment record.
The plaintiff, Rehabilitative Resources, Inc. (“RRI”) is a nonprofit corporation serving the developmentally disabled of central Massachusetts. It is, the parties agree, a nonprofit educational corporation within the meaning of that term in G.L.c. 40A, §3, para, second. It currently employs over 300 individuals at various locations, having expanded significantly since it first came to Sturbridge in 1983.
RRI owns a 2.33-acre parcel at 171 Charlton Road (Route 20), Sturbridge. It is most easily visualized, and in fact is zoned, in two portions.
The front portion is 75 feet wide and 300 feet deep. It lies in Sturbridge’s Commercial II zoning district, and is referred to herein as the front or “corridor” portion.
Tacked onto the back of this is a larger, quadrangular piece lying in the Rural Residence district. This piece has no frontage of its own, and is referred to herein as the back or “quadrangle” portion.
The site presently contains a two-stoiy office building, located in the corridor portion and comprising about 6,000 square feet. This was constructed in 1987-88 by a developer who, at one time, rented it out as commercial office space to five different tenants. RRI was one of these, until it purchased the site in 1998.
Presently, RRI uses the site for administrative and training purposes. The latter includes training members both of the developmentally disabled population and of the general public; the parties therefore agree that the site is used for educational purposes, again as that term is used in G.L.c. 40A, §3, para, second. Twenty-one RRI employees currently use the building. Among the services RRI provides is transportation. It maintains a fleet of about 30 vans or small buses at the site, each making between two and four round trips per day. It plans to continue this part of its operation at the site, after its proposed construction project.
On April 10, 2002 RRI submitted an application for site plan review to the Sturbridge ZBA. Proposed was a new two-stoiy, 13,015 square-foot office building, to lie entirely on the Rural Residence portion of the site. If permitted to construct the new building, RRI would relocate twenty employees there from rented space at 173 Charlton Road (next door), and would also continue to use the existing building, thereby tripling the amount of office space on the site and increasing the number of employees situated there from 21 to 41.[1] It would also continue to use the site for its van/bus fleet and operations.
The site has, or else would have after the proposed construction, a number of nonconformities with current zoning requirements.
Frontage. Ihere is approximately 75 feet of frontage (i.e., the westerly end of the corridor), all on Route 20 and within the Commercial II district. The Sturbridge Zoning Bylaw requires 150 feet of frontage in both the Commercial II and Rural Residence districts. The site is thus nonconforming as to frontage.
Lot width. The Bylaw requires, in both the Commercial II and Rural Residence districts, 150 feet of lot width, as measured at the front setback line and parallel to the frontage. Being only 75 feet wide according to this measure, the lot is nonconforming as to width.
Setbacks /Buffering. To access the back portion of the site on which the new building would be located, employees and visitors would enter from Route 20 and travel the length of the corridor. The current building sits roughly in the middle of the corridor (slightly closer to the south boundary than the north), leaving passageways on either side, between ten and fifteen feet in width, between the building walls and the lot lines. Two single-lane driveways— *450 one in, one out — would thus pass on either side of the building. The ingress would take up all of the space between the south side of the building and the south lot line. The egress would abut the north side of the building and would lie between four and ten feet of the north boundary. Even the driveway portions on the wider quadrangle portion are, for the most part, within ten feet of lot lines.
In the quadrangle portion, a parking lot constructed in 1991 abuts the site’s northern boundary for most of its 121-foot length.[2]
The Bylaw requires, for projects subject to site plan review, buffer zones between parking and driveway areas and abutting land; these must be 20 feet when the abutting land is Residential; 10 feet when it is Commercial; with 4 feet allowed “[i]f it is a confining site” as determined by the Planning Board. Driveways are permitted in the buffer zones only for “necessary access to the site.” (Section 25.02 and 25.06(k).)
The proposed project thus would violate the setback/buffer requirements, in that (a) the quadrangle parking area is 0-4 feet from the lot line, rather than the 20 feet required; and (b) the ingress driveway directly abuts the southerly properly line, and the egress driveway runs between four and ten feet of the northerly line, without (so far as the record discloses) any Planning Board finding that the site is a “confining site,” thus running afoul of the buffers for the non-residential zone (ten feet; four feet if a confining site).
Lot Coverage. For the Commercial II district, the Bylaw (Chapter 19) permits no more than 70% of lot area to be covered by impervious surface. The corridor (i.e., the portion of the site in the Commercial II district) is 22,250 square feet, of which approximately 17,750 (80%) would be taken up by building and driveways, making this portion non-compliant with Chapter 19. (There is no corresponding requirement for the rural residential district.)
Route 20, on which the site has its frontage, is a heavily traveled four-lane state highway divided by a double yellow line. The speed limit in the area of the site is 50 miles per hour. In the immediate area of the site are a bank (with two curb cuts and a drive-up teller window) and a truck stop (760 feet of frontage and four curb cuts). A mall containing a Walmart, a Stop and Shop, and ten or so other stores is a quarter-mile down Route 20; a traffic light at this point frequently backs up traffic along Route 20 to the area of the site. A quarter-mile further is the intersection of Interstates 90 and 84, and access to both from Route 20, which provides the most direct route from both interstates to Sturbridge and six other central Worcester County towns. The Town’s efforts to obtain Mass. Highway approval to install a centerline barrier or other traffic control measures have proved unavailing.
There are several vacant and developable lots abutting Route 20 in the area immediately around the site. These include 198 Charlton Road, across the street and 300 feet to the southwest, and 165 Charlton Road, which abuts the site to the northeast.
DISCUSSION
The Dover Amendment — G.L.c. 40A, §3, second par., as inserted by St. 1975, c. 808, §3 — -provides, in pertinent part, as follows.
No zoning ordinance or by-law shall . . . prohibit, regulate or restrict the use of land or structures for religious purposes or for educational purposes on land owned or leased by the commonwealth or any of its agencies, subdivisions or bodies politic . . . provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements.
The amendment, whose history is recounted in The Bible Speaks v. Board of Appeals of Lenox, 8 Mass.App.Ct. 19, 27 n. 10 (1979), was “intended to encourage a degree of accommodation between the protected use and matters of critical municipal concern,” Trustees of Tufts College v. Medford, 415 Mass. 753, 760 (1993), by preventing municipalities from prohibiting or restricting religious and educational uses, while preserving the traditional local control over the physical aspects of such use. In part,
[t]he amendment insures that a municipality will not express “preferences as to what kind of . . . religious denominations it will welcome,” by providing that religious uses can be placed at suitable sites in a community, subject only to reasonable dimensional regulations.
Southern New England Conference Ass’n of Seventh-Day Adventists v. Burlington, 21 Mass.App.Ct. 701, 706, quoting The Bible Speaks, 8 Mass.App.Ct. at 33. Thus, a regulation which restricts religious or educational uses per se, or which subjects properties in either such use to permitting requirements not applicable to other uses, runs afoul of the statute’s core values, and will be invalidated. See id.
Additionally, dimensional regulations must be “reasonable.”
[T]he town may not, through the guise of regulating bulk and dimensional requirements under the enabling statute, proceed to “nullify” the use exemption permitted to an educational institution.
Id., citing Sisters of the Holy Cross of Massachusetts v. Brookline, 347 Mass. 486, 494 (1964). In the Tufts College case, the SJC enunciated what has since been called “an ad hoc, fact-specific approach to resolving disputes in most §3 situations.” Petrucci v. Board of Appeals of Westwood, 45 Mass.App.Ct. 818, 825 (1998). Under this approach,
*451 Local zoning requirements adopted under the proviso to the Dover Amendment which serve legitimate municipal purposes sought to be achieved by local zoning, such as promoting public health or safety, preserving the character of an adjacent neighborhood, or one of the other purposes sought to be achieved by local zoning as enunciated in St. 1975, c. 808, §2A, may be permissibly enforced, consistent with the Dover Amendment, against an educational use ... [A] local zoning provision that requires an educational institution to. adapt plans for the use of its land may be enforced, so long as the provision is shown to be related to a legitimate municipal concern, and its application bears a rational relationship to the perceived concern. On the other hand, a zoning requirement that results in something less than nullification of a proposed educational use may be unreasonable within the meaning of the Dover Amendment.
[T]he question of the reasonableness of a local zoning requirement, as applied to a proposed educational use, will depend on the particular facts of each case. Because local zoning laws are intended to be uniformly applied, an educational institution . . . will bear the burden of proving that the local requirements are unreasonable as applied to its proposed project. The educational institution might do so by demonstrating that compliance would substantially diminish or detract from the usefulness of a proposed structure, or impair the character of the institution’s campus, without appreciably advancing the municipality’s legitimate concerns. Excessive cost of compliance with a requirement imposed on an educational institution, without significant gain in terms of municipal concerns, might also qualify as unreasonable regulation of an educational use. We reject the suggestion that only local zoning requirements drafted specifically for application to educational uses are reasonable within the scope of the Dover Amendment. Nothing in that statute mandates the adoption of local zoning laws which are tailored specifically to educational uses. Similarly, proof that a local zoning law could accomplish its purpose if it were drafted in terms other than those chosen will not suffice to establish that the municipality’s choice of regulation is unreasonable.
415 Mass. at 757-60 (citations and footnotes omitted).
The dimensional and lot coverage requirements at issue in this case are “use-neutral,” see Southern New England Conference Ass’n of Seventh-Day Adventists, 21 Mass.App.Ct. at 706, and serve important and legitimate goals of land use control. These “include lessening congestion in the streets, conservation of health, securing safety from fire and other dangers, provision of adequate light and air, prevention of overcrowding of land, and avoidance of undue concentration of population." MacNeil v. Avon, 386 Mass. 339, 341 (1982), citing St. 1975, c. 808, §2A. Often, a single requirement serves multiple purposes: minimum frontage requirements, for example, “deal[ ] with the spacing of buildings and the width of lots as well as access.” Hobbs Brook Farm Property Co. v. Planning Bd. of Lincoln, 48 Mass.App.Ct. 403, 406 (2000). They also work in conjunction with lot size and coverage requirements to control density of development. See McCausland v. Board of Appeals of Salisbury, 6 Mass.App.Ct. 288, 289 (1978); Simon v. Needham, 311 Mass. 560, 563 (1942). Setback requirements afford privacy, light, air, and drainage; the latter purpose is also advanced by limitations on lot coverage.
When, then, do facially sound bulk and dimensional requirements become unreasonable in their application to a particular educational project? Tufts College and the other appellate decisions on the subject offer little by way of specific, practical guidance for this fact-specific inquiry, beyond the following:
“[A] zoning requirement that results in something less than nullification of a proposed educational use may be unreasonable within the meaning of the Dover Amendment.” Id.
However, some degree of flexibility, in adapting plans to meet valid zoning objections, may be required of the institution. Id.
A religious or educational user generally meets its burden if it shows that compliance would impose on it either undue cost, or substantial impairment of the usefulness or character of the facility. Id.
On this last point, it bears noting that many— though by no means all[3] — of the leading cases in this area have dealt with educational institutions having substantial investments, of capital and frequently of tradition, in established campuses. An institution situated, and committed to remaining, on a large, special-use property has fewer options, by at least one, than the user of a more traditionally fungible property: the latter may be able to accommodate its needs on a different property in the area, whereas the former almost certainly cannot. Particularly where the institution seeks to develop a relatively fungible property, the availability of alternative sites in the area may enter into the reasonableness calculus. As the SJC stated in Campbell v. City Council of Lynn, 415 Mass. 772, 780 n.9 (1993):
Our decision does not imply that any nonconforming structure for which an educational use is proposed will necessarily be free from the bulk and dimensional requirements of a local zoning law. . . Local zoning officials properly could refuse a building permit for alterations to a nonconforming structure where, for example, the failure to meet local zoning requirements raised safety concerns.
... It is unlikely that an educational user proposing to build a new structure on a single small lot could argue successfully that dimensional, coverage and *452 parking requirements would be unreasonable as applied to the property . . . [I]n these circumstances, local officials might be warranted in requiring that an educational user seek an alternative site.
Turning, then, to the case at hand: As noted above, the undisputed facts of record establish that the Sturbridge zoning bylaw is facially use-neutral; that is, it imposes no greater or different requirements on religious and educational institutions than on other landowners. The provisions at issue in this case all serve legitimate and important objectives of local land use regulation: density control, provision of light and air, traffic safety and decongestion, and control of runoff.
Nor are they unreasonable as applied to RRTs project. The site is already nonconforming as to the setback and lot width requirements. Although the proposed construction will not lessen the frontage or make the lot narrower, it will substantially intensify the use, and therefore the issues of access, density, light and air that those requirements are intended to address. Setbacks would be virtually nonexistent over much of the site’s perimeter. Lot coverage by impervious surface would, on the Commercial portion of the site, substantially exceed the permitted 70%.
Finally, RRI has not shown that it will be excessively burdened by compliance, or at least substantial compliance, with the zoning bylaw, its facility is, by all accounts, a relatively fungible commercial office building. It is neither a campus, nor a single-purpose structure, nor the last developable site in town. That RRI may have outgrown it, and may wish to consolidate its operations as between the site and rented space next door, is not sufficient to carry its burden of showing that otherwise legitimate land use regulation would unreasonably interfere with its educational mission.
ORDER
For the foregoing reasons, the plaintiffs motion for summary judgment is DENIED, and the defendants’ cross-motion for summary judgment is ALLOWED. Judgment will enter, dismissing the Complaint.

The additional twenty employees would be relocated from a building at 173 Charlton Road — next door — which RRI leases.

The rear parking lot was approved by the Planning Board to provide additional parking for the existing building.

In addition to the Tufts, Sisters of the Holy Cross, and The Bible Speaks cases, there are also Radcliffe College v. Cambridge, 350 Mass. 613 (1966); Trustees of Boston College v. Aldermen of Newton, 58 Mass.App.Ct. 794 (2003); Newbury Junior College v. Brookline, 19 Mass.App.Ct. 197 (1985). Educational use cases not involving campuses, on the other hand, include Watros v. Greater Lynn Mental Health & Retardation Ass'n., Inc., 421 Mass. 106 (1995) (barn on residential lot); Campbell v. City Council of Lynn, 415 Mass. 772 (1993) (three-story, twenty-seven-room building in business zone); Gardner-Athol Area Mental Health Ass'n v. Zoning Bd. of Appeals of Gardner, 401 Mass. 12 (1987) (single-family residence).