OPINION OF THE COURT
Joseph D. Mintz, J.
Petitioner seeks an order pursuant to CPLR article 78 overturning respondents’ denial of a use permit as applied for. Petitioner seeks to change the program of its building at 4 Vermont Street from one used as a residential care institution for predelinquent and delinquent young men age 16 to 21 (Buffalo Boys Town) to an intermediate care facility for the developmental^ handicapped.
The building at 4 Vermont Street had been used for its prior purpose since 1940. From the time of its commencement until 1953, the building was in all manners in compliance with the Buffalo Zoning Ordinances. From 1953 to present, 4 Vermont Street has been zoned R3. Since 1953, the building was not in compliance with the use ordinances, such use permitted being in zone R4, but not R3, nor has it been in compliance with the setback requirements for certain nonprofit institutions. Respondents found that the building had been operated as a permitted nonconforming use. There was no express finding that the nonconforming use was in any way discontinued, and the change to an intermediate care facility was tested as a change of nonconforming use; thus, implicit in the board’s determination was a finding that the nonconforming use was not discontinued.
If the proposed change is to be tested as a change in nonconforming use alone, the use permit must be denied. Changes in nonconforming uses are governed by subdivision (2) of section 18 of the Buffalo Zoning Ordinance, *338 which provides in part: “Any land, premises, building or structure arranged or designed for or devoted to a nonconforming use, may be changed in use when changed to a more restrictive use classification, but where the nonconforming use of a building, structure, premises or land is hereafter changed to a more restrictive use classification it shall not thereafter be changed to a less restrictive use classification. For the purpose of this subdivision, a use shall be deemed changed to a more restrictive use classification if the new use be one that is permitted in a section of this chapter with a lower number than the section under which the former use was permitted.” Thus, a change in use from one nonprofit institution (permitted under R4) to another nonprofit institution (also permitted in R4), is not a change to a “more restrictive use” but to an equally restrictive use. Changes to a more restrictive use do not include changes to an equally restrictive use pursuant to the interpretation of an identical Buffalo ordinance by the Court of Appeals in City of Buffalo v Roadway Tr. Co. (303 NY 453). Petitioner argues that the proposed change involves the change from a use not permitted in any district to a use permitted in R4. It bases this argument on the failure of Buffalo Boys Town to comply with setback requirements, and a rather intricate argument that the proposed purpose does not require similar setback requirements. Although this may be the case, subdivision (2) of section 18 of the ordinance makes clear that a change in use must entail a change to a more restrictive use classification. Although the particular building when used as Boys Town might not be permitted in an R4 district, the use of a building as a Boys Town is permitted in R4. Thus, the use of the premises before was one permitted in R4 and the use proposed is permitted in R4. Such a change does not comply with subdivision (2) of section 18 as a permissible change in use. As to the failure to comply with setback requirements, this may bear simply on the question of whether the nonconforming structure is permitted. As long as the structure is continuously nonconforming, it is permitted under subdivision (1) of section 18.
Petitioner argues, however, that subdivision (2) of section 18 may be inapplicable since the proposed change does *339 not entail a “change in use”. In this context, change in use is a term of art, and must be examined under applicable ordinances and judicial authority. If the proposed program does not involve a change in use, the nonconforming use may be continued under subdivision (1) of section 18. In addition, respondents’ argument that the proposed change-should properly have been brought before the Common Council under subdivision (8) of section 15A, which requires council approval for certain changes in use, would be ineffectual if there were no change in use.
The use classification for Buffalo Boys Town is found in section 7 (subd [a], par [3]): “Nonprofit institutions for charitable, religious, cultural, or civic purposes, subject to that part of section 5(a) (8) regarding institutions primarily for contagious disease patients, mental patients, epileptics, drug or liquor addicts, insane or feeble-minded, or for penal or correctional purposes; but not including the handling, repairing, processing, keeping or displaying of any merchandise or the rendering of merchandising services on the premises.” This use classification is the same one as that for the proposed use. In fact, all nonprofit institutions fall in the same use classification. However, this is not to say that a change from one type of nonprofit institution to another would not constitute a change in use. For example, the change of a building from one used for offices for a charitable organization to a city mission for derelicts, would certainly be a change of use although each use is of the same use classification. It is the particular use and not the general classification that governs. In determining if the proposed use entails a “change in use”, each case must stand on its own facts. (See, generally, 4 Yokley, Zoning Law and Practice [4th ed], § 22-6.) In making this determination, the court is guided by two decisions: President & Trustees of Vil. of Ossining v Meredith (73 NYS2d 897) and Rogers v Association for Help of Retarded Children (308 NY 126). In Rogers, the change from an institution for the care (including the schooling) of children suffering from cardiac disorders to a school for retarded children was deemed to be the continuation of the building’s use as a school. In Meredith (supra), the change from a lot for the storage of poles and cables to the storage of freight trucks *340 and buses was considered a change in use. In oft-cited language, the court reasoned: “It seems, however, clear to me that the storage of a motor vehicle, i.e., a freight truck or a bus is a sufficiently different use from the storage of poles, cable and pipe to require an injunction against the defendants forbidding that use. It seems to me equally clear, however, that the storage of a trailer cannot be intelligently distinguished from the storage of * * * objects which have no power of locomotion and do not in themselves offer more or less offense, or require more or less toleration. In other words, storage is storage and only when the nature of the thing stored is vastly different and in itself creates new problems is it reasonable to call a change of the object stored a change of use.” (President & Trustees of Vil. of Ossining v Meredith, supra, pp 898-899; emphasis added.) Analogously, it can be said here that housing individuals is housing individuals and only when the nature of the persons housed is vastly different and in itself creates new problems is there a change in use. However, the proposed use does entail the housing of individuals that are vastly different and that create new problems. The use of the facility as Boys Town entailed the need for some moderate supervision, but required more in the way of counseling and some spiritual supervision rather than anything approaching day-to-day, minute-to-minute supervision of the type contemplated in the operation of an intermediate care facility for the developmentally disabled. The record of the hearing before the board reveals that if the proposed use is effectuated, there will be 30 residents plus 53 supervising attendants. There is no question that the type of resident will need far greater supervision than the type of resident during the use as Buffalo Boys Town. This, however, could not be said of the situation in Rogers (supra), where it is likely that children with cardiac disorders living there 24 hours a day required at least as much supervision as retarded children coming in for a few hours each day. The Court of Appeals in that case recognized that the new purpose actually involved a cessation of some of the prior uses and a continuation of others. That is not the case here. The proposed change involves an increase in the intensity of supervision and activity, and as *341 such, involves a change in use. Thus, subdivision (2) of section 18 of the Buffalo Zoning Ordinance applies, and the proposed change is not permissible.
Petitioner and intervening petitioner argue that denial of the use permit is in contravention of State policy favoring the implementation of intermediate care facilities like the one proposed here. Although State policy favoring the implementation of intermediate care facilities is quite strong, the statutes which form the basis of that State policy do not expressly nor by any reasonable inference require that local law be disregarded. To the contrary, for example, is the requirement under section 41.34 of the Mental Hygiene Law that agencies which sponsor community residential facilities co-operate with the municipalities so that the facilities are placed at the best possible sites, and section 41.34 allows the municipality to suggest alternate sites. To the extent the statutes involving com- : munity residential facilities define, for example, “family” for the purpose of complying with the local zoning ordi- ¡ nances which require use as single-family homes, the State I statute would, of course, override local definitional ordinances. (Zubli v Community Mainstreaming Assoc., 102 Misc 2d 320.) But absent any such specific statute, or any 1 declaration in the law such as “‘Notwithstanding any ! other provision of law’ ”, as was present in People v St. Agatha Home for Children (47 NY2d 46, 49), local law still controls. Furthermore, it is the policy of the State as evidenced by section 41.34 of the Mental Hygiene Law to allow municipalities input into the site selection of community residential facilities, which term includes all intermediate care facilities which are to house 4 to 14 mentally disabled persons. (14 NYCRR 681.3 [c].) Surely then, in selecting the site for an intermediate care facility which is to house 30 persons with 53 supervisory attendants, the municipality must have at least as much input. Thus, in this case, the zoning ordinances control the placement of such a facility. If it were the case that the municipality through its zoning prevents the location of such a facility anywhere within its borders, such zoning ordinances may be stricken as disruptive of enunciated State policy. (Abbott House v Village of Tarrytown, 34 AD2d 821.) However, *342 neither petitioner nor intervening petitioner allege this to be the case here. Therefore, the zoning ordinances of the City of Buffalo must be complied with.
Petitioner also argues that the decision of the zoning board to deny the use permit interferes with petitioner’s religious function, and that the zoning ordinance’s limitation of the property only to uses permitted in R3 cannot apply to the diocese. It is constitutionally required that municipalities do not deny a religious use to property on the basis of overcrowding, increased traffic, diminution of property values or the like. (Matter of Community Synagogue v Bates, 1 NY2d 445.) However, it is also clear that the municipality may regulate, without zoning out, religious uses. (Matter of Westchester Reform Temple v Brown, 22 NY2d 488.) Finally, the constitutional protection is afforded only to religious uses, not to all uses instituted by a religious society. If, for example, the diocese were to use the premises for a country club, this would definitely not be a religious use. (See Matter of Community Synagogue, supra, p 453.) Although the purpose to which petitioner plans to put its premises is a laudable, community-minded use, it is not a religious use, but simply a charitable use, and as such, is subject to the same regulations as any other charitable organization. Religious purposes can include such community-minded uses as a day care center (Matter of Unitarian Universalist Church of Cent. Nassau v Shorten, 63 Misc 2d 978), a center for drug problems (Slevin v Long Is. Jewish Med. Center, 66 Misc 2d 312), and the teaching of secular subjects (Westbury Hebrew Congregation v Downer, 59 Misc 2d 387), but only when these uses are merely accessory and ancillary to the principal use of the structure as a place of worship (Matter of Diocese of Rochester v Planning Bd. of Town of Brighton, 1 NY2d 508), a religious school (Westbury Hebrew Congregation, supra), or the office from which the house of worship or religious school is run (Matter of Faith for Today v Murdock, 11 AD2d 718). Where the sole use of the premises is for such a charitable use, the use is not religious, and is, thus, not subject to First Amendment protection. Since the proposed use is not simply ancillary or accessory to a *343 traditionally religious use by the diocese, it is subject to the Buffalo Zoning Ordinance.
Finally, respondents and intervening respondent challenge the jurisdiction of the zoning board vis-á-vis Common Council due to the possible application of subdivision (8) of section 15A of the ordinance which requires the consent of the Common Council to certain changes in use. Since the proposed change is not permissible either under the zoning or as a nonconforming use, it is not necessary to address this question.
For the foregoing reasons, the decision of the zoning board in denying a use permit to the petitioner for the proposed intermediate care facility is upheld.