# Trustees of Boston College *vs.* Board of Aldermen of Newton.

No. 01-P-334.

Suffolk. November 19, 2002. - August 8, 2003.

Present: Jacobs, Cypher, & Kantrowitz, JJ.

*Zoning,* Educational use, Validity, Special permit, Parking. *Education,* Zoning. *Statute,* Construction.

Discussion of the Dover Amendment, G. L. c. 40A, § 3, second par., which bars the adoption of a zoning ordinance or by-law that seeks to prohibit or restrict the use of land for educational purposes. [798]

In an action brought in Land Court by a college, claiming that the special permit procedures for the reconstruction of a legally nonconforming structure in the city of Newton violated the Dover Amendment, G. L. c. 40A, § 3, second par., the judge correctly determined that the procedures were not unreasonable per se. [798-800]

In an action brought in Land Court by a college under G. L. c. 40A, § 17, and G. L. c. 240, § 14A, contesting the applicability of the local zoning ordinance to a proposed construction project on the college's campus, the judge correctly concluded that density requirements in the ordinance were unreasonable as applied to the college as a whole and the project in particular, where the practical effect of their application was to require the college to seek discretionary relief through a super majority vote of the zoning board each time it sought to build any habitable space on campus. [800-803]

In an action brought in Land Court by a college under G. L. c. 40A, § 17, and G. L. c. 240, § 14A, contesting the applicability of the local zoning ordinance to a proposed construction project on the college's campus, the judge correctly concluded that height, story, and setback requirements in the ordinance, although presumptively valid and capable of general application to the campus [803], were unreasonable as applied to the construction project, where the college demonstrated that compliance with the regulations would substantially diminish or detract from the usefulness of the project, or impair the character of the campus, without appreciably advancing the city's legitimate concerns [803-806].

In an action brought in Land Court by a college under G. L. c. 40A, § 17, and G. L. c. 240, § 14A, contesting the applicability of parking regulations contained in the local zoning ordinance to a proposed construction project on the college's campus, the judge properly determined that the zoning board was justified in denying the college's application for a special permit

for a parking waiver and correctly remanded the issue of the parking requirements to the board, where the application of the parking regulations, as written, resulted in an over-counting of required parking spaces on the campus, but the evidence nonetheless indicated that the proposed project could require additional parking beyond what was currently available. [806-810]

CIVIL ACTION commenced in the Land Court Department on October 23, 1996.

The case was heard by *Karyn F. Scheier*, J.

*Arthur P. Kreiger* (*Ouida C.M. Young*, Associate City Solicitor, with him) for the defendant.

*John Kenneth Felter* (*David R. Zipps* with him) for the plaintiff.

CYPHER, J. This appeal concerns whether dimensional, parking, and other regulations within the city of Newton's zoning ordinance can be applied to a construction project planned by the Trustees of Boston College (BC). In 1996, BC applied to the Newton board of aldermen (the board) for special permits to construct three connected buildings, called the Middle Campus Project (MCP), and for relief from the parking regulations of the city's zoning ordinance. As proposed, the MCP will be located near the southwest corner of the Middle Campus and will provide additional space for the academic functions of BC's College of Arts and Sciences, for student activities, and for support services to students and faculty. It includes Gothic architectural features intended to be consistent with the architecture of other long-standing buildings on the Middle Campus.

Following the review process, BC's applications were denied when the vote of the board fell short of the required super majority.[1] BC filed a five-count complaint in the Land Court under G. L. c. 40A, § 17, and G. L. c. 240, § 14A, claiming that the board acted in excess of its authority and challenging the application of Newton's zoning regulations under the Dover Amendment, so-called, appearing in G. L. c. 40A, § 3, second par. (See note 4, *infra*.)

---

[1] A two-thirds vote is required of the twenty-four member board for the issuance of a special permit. See G. L. c. 40A, § 9. The vote was thirteen in favor and eleven opposed.

After trial, the Land Court judge applied *Trustees of Tufts College* v. *Medford*, 415 Mass. 753 (1993), and concluded that the dimensional and density regulations were unreasonably applied to the Middle Campus and the MCP. The judge also determined that the board reasonably could conclude that the demand for parking would be greater than the supply and, therefore, that the board was justified in denying BC's application for a special permit for a parking waiver. The judge remanded the parking issue to the board. BC and the board cross-appeal.[2]

The board claims that the judge erred by (1) invalidating the floor area ratio (FAR) density requirement of the zoning ordinance as applied to the entire Middle Campus; (2) failing to address the application of the FAR regulation specifically to the MCP; (3) improperly annulling the height, story, and setback dimensional regulations as applied to the MCP; and (4) improperly annulling the parking requirements. BC claims on cross appeal that the judge erred by remanding the issue of parking to the board and in refusing to invalidate the procedures BC must follow in order to obtain relief from the ordinance's dimensional requirements based on its status as an educational institution having Dover Amendment protections.

We agree that the FAR regulations and the dimensional regulations violated the Dover Amendment. Accordingly, we affirm the portion of the order that annulled the FAR regulation as applied generally to the Middle Campus and specifically to the MCP and that also annulled the dimensional requirements as applied to the MCP. We also affirm the portion of the order that annulled the parking requirements as applied to the Middle Campus and the MCP and the portion of the order remanding the parking issue to the board and upholding the denial of a parking waiver.

1. *Background.* The board does not challenge the judge's extensive and comprehensive findings of fact. We summarize the relevant findings and also reproduce in Appendix A to this decision a simplified version of a trial exhibit, which depicts the

---

[2]The parties stipulated that the board effectively represents the city of Newton for appellate purposes. The city is the only defendant named in the two principal counts of BC's complaint.

main buildings, streets, and open spaces of the Middle Campus and adjacent areas, including the MCP, which is labeled on the exhibit as "Bld. A," "Bld. B," and "Bld. C."

BC's student population, in its undergraduate, graduate, and evening divisions, had remained relatively stable for approximately twenty years preceding the 1996-1997 academic year; however, use of the campus became more intense during that period. For example, only fifty-two percent of undergraduates resided on campus in the academic year 1977-1978, whereas seventy-four percent resided on campus in 1996-1997, indicating BC's evolution during those years from a local commuter school.

The Middle Campus consists of approximately thirty-nine acres of land located in the Chestnut Hill area of Newton. The Middle Campus comprises twenty buildings, the most significant of which is Gasson Hall, constructed in 1913, with its distinctive tower and Gothic architecture, and a large open space, called the Campus Green, located near the MCP. The three connected buildings constituting the MCP would be placed along College Road, in roughly a southwest to northeast direction. Buildings A and B will be placed on portions of the existing Campus Green and an existing parking lot. Building C will be placed near the apex of the intersection of Beacon Street and College Road. Building C will replace McElroy Commons, a 1960's-era structure, which will be demolished.

Building A will house classrooms, seminar spaces, a 560-seat lecture hall, graduate student work spaces, faculty offices, and faculty lounges for the College of Arts and Sciences. Building B will provide space for student services, office space, and a computer center to be relocated from the O'Neill Library (the main BC library) relieving a space shortage there. Building C will include dining facilities and will replace or expand many activities that are presently housed inadequately in McElroy Commons.[3]

After detailed analysis of the density and dimensional require-

---

[3]McElroy Commons was deemed inadequate for a number of reasons: deliveries of goods and supplies follow no fixed route and, thus, tend to interfere with users of the facility; program space is poorly configured; and there is inadequate space for food preparation and storage, for student

ments in issue, the judge concluded that BC had established that the MCP will best fill the school's "pressing and immediate need for more and improved space to serve current needs." She found that the MCP design "will accommodate current needs, but has little growing room," and that compliance with the density and dimensional regulations would substantially diminish the MCP's usefulness to BC.

2. *The Dover Amendment.* "The Dover Amendment bars the adoption of a zoning ordinance or by-law that seeks to prohibit or restrict the *use* of land for educational purposes. However, a proviso to the statute authorizes a municipality to adopt and apply 'reasonable regulations' concerning bulk, dimensions, open space and parking, to land and structures for which an educational use is proposed." *Trustees of Tufts College* v. *Medford*, 415 Mass. 753, 757 (1993).[4] In challenging the reasonableness of applying the city's zoning requirements to the MCP, BC had to demonstrate that compliance with these requirements would "substantially diminish or detract from the usefulness of a proposed structure, or impair the character of the institution's campus, without appreciably advancing the municipality's legitimate concerns." *Id.* at 759.

3. *Special permit under G. L. c. 40A, § 6.* Because BC's application for a special permit involved the demolition and rebuilding of McElroy Commons, the parties treated it as a request under G. L. c. 40A, § 6, to reconstruct a legal, nonconforming structure requiring a finding by a super majority of the board that the MCP would not be substantially more detrimental to the neighborhood than is the current legal,

organizations and functions, or for bookstore and postal facilities. BC concluded in a 1993 study that every day, approximately one thousand persons ate lunch off campus because of McElroy Commons' inadequate dining facilities. Among other goals of the MCP is to upgrade these dining facilities.

[4]The Dover Amendment is embodied in G. L. c. 40A, § 3, second par., the relevant provisions of which are: "No zoning ordinance or by-law shall regulate or restrict . . . the use of land or structures . . . for educational purposes on land owned . . . by a nonprofit educational corporation; provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements."

For a history of the Dover Amendment, see *The Bible Speaks* v. *Board of Appeals of Lenox*, 8 Mass. App. Ct. 19, 27 n.10 (1979).

nonconforming McElroy Commons.[5] When the special permit application was denied, BC filed this action in the Land Court, claiming that the special permit procedures for legal, nonconforming structures that appear in section 30-21(b) of the Newton zoning ordinance and in c. 40A, §§ 6 and 9, violate the Dover Amendment.

The judge described BC's argument as claiming that the level of discretion given the board by the requirement of a super majority vote and the deferential standard of judicial review generally afforded decisions by special permit granting authorities are "trumped" by the Dover Amendment's broad protections from zoning regulation afforded to property of a religious or educational institution. In other words, according to BC, the Dover Amendment protections prevent the board from exercising the sort of latitude it otherwise would have under § 6 to deny a special permit to a non-Dover user to reconstruct or expand a legally nonconforming structure. The judge rejected this challenge, reasoning that the ordinance's provisions may be reviewed for validity as applied to BC under both the Dover Amendment and G. L. c. 240, § 14A.[6] If they survive this challenge, the applicant may still proceed, as would any other property owner, by seeking a determination under § 6 and section 30-21(b) of the zoning ordinance that the proposed reconstruction or alteration is not substantially more detrimental to the neighborhood than the existing structure. See *Campbell* v.

---

[5]General Laws c. 40A, § 6, states in relevant part: "Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the . . . special permit granting authority . . . that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood."

A municipality may choose, as Newton has done, the special permit procedure described in c. 40A, § 9, as the procedural avenue an applicant must follow in seeking a § 6 finding authorizing the expansion or extension of a nonconforming structure.

[6]General Laws c. 240, § 14A, provides in relevant part: "The owner [of land] may bring a petition in the land court against a city or town wherein such land is situated . . . for determination as to the validity of a municipal ordinance, by-law or regulation, passed or adopted under the provisions of chapter [40A] . . . which purports to restrict or limit the present or future use . . . of such land . . . by the erection, alteration or repair of structures thereon . . . ."

*City Council of Lynn,* 415 Mass. 772, 777 n.6 (1993). Thus, there is that additional opportunity to secure a permit.[7]

We agree with the judge that the special permit procedure, in itself, cannot be declared invalid in all circumstances involving educational institutions. The Dover Amendment permits reasonable density, dimensional, and parking regulations to be applied to a Dover user. "[T]he question of the reasonableness of a local zoning requirement, as applied to a proposed educational use, will depend on the particular facts of each case." *Trustees of Tufts College* v. *Medford, supra* at 759. A municipality may not, however, "through the guise of regulating bulk and dimensional requirements under the enabling statute, proceed to 'nullify' the use exemption permitted to an educational institution." *The Bible Speaks* v. *Board of Appeals of Lenox,* 8 Mass. App. Ct. 19, 31 (1979), citing *Sisters of the Holy Cross* v. *Brookline,* 347 Mass. 486, 494 (1964). Accordingly, we uphold the Land Court's determination that the regulations on reconstructing a nonconforming building applied by the board were not unreasonable per se.

4. *Dimensional and density regulations applied to the Middle Campus and the MCP.* The dimensional and density regulations here at issue include floor area ratio (FAR) density regulations and the height, story, and setback dimensional regulations. They

---

[7]In fact, BC acknowledged in its complaint that it has received approval for several projects in the past without relying upon its special zoning status under the Dover Amendment. Instead, it has followed the ordinary procedures prescribed by the Newton zoning ordinance to obtain permits to renovate existing buildings or to construct new buildings on the Middle Campus. The procedures followed in this case were extensive and included public hearings and review by the city's planning department and the board's land use committee. Those procedures led to key accommodations between BC's needs and Newton's municipal concerns and were expressed in a draft order that was submitted to the board for approval of the permits with conditions.

The "Dover Amendment is intended to encourage 'a degree of accommodation between the protected use . . . and matters of critical municipal concern.' (citations omitted)." *Trustees of Tufts College* v. *Medford, supra* at 760. See *Martin* v. *The Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints,* 434 Mass. 141, 144 (2001). Here, unfortunately, those accommodations effectively were negated when the proposed order failed to attract a super majority of the board, resulting in denial of the permits. Moreover, that denial also put aside any opportunity for the board reasonably to regulate a permitted use through site plan review. See *Osberg* v. *Planning Bd. of Sturbridge,* 44 Mass. App. Ct. 56, 57 (1997), and cases cited.

are listed in Table 2 of the zoning ordinance, a summary of which, taken from the parties' stipulation, is reproduced as Appendix B to this decision.[8]

a. *The FAR regulation as applied to the entire Middle Campus.* FAR is the gross floor area of all buildings on the Middle Campus (which the board treats as a single lot) divided by the total lot area and, thus, is a measure of density. For example, a building with 2,000 square feet of habitable space upon a lot of 20,000 square feet would yield a FAR of 10% or .1. When Table 2's FAR regulation was adopted by Newton in 1987, the entire Middle Campus became nonconforming based on a FAR value of 0.95, well in excess of Table 2's maximum permitted value of 0.46. The proposed MCP would increase the FAR on the Middle Campus from the current 0.98 to 1.14. The practical effect of the FAR regulation is that Boston College must secure a § 6 finding (and a § 9 special permit requiring a super majority vote) for any building construction on the Middle Campus that will increase gross floor space there.

The judge concluded, correctly we think, that the "FAR regulation requires Boston College to seek discretionary relief through a super majority vote of the Board each time it wants to build any habitable space on the Middle Campus. This procedure is tantamount to requiring a special permit for the educational use itself, which offends the spirit, if not the letter, of the Dover Amendment."

The judge stated that while it is "possible that a Dover user's right to reasonable growth may be limited or even capped pursuant to reasonable municipal regulation without offending the Dover Amendment," she found no evidence in this case that such a "saturation point" had been reached for the Middle Campus. The judge noted how, in the past, the board had approved under c. 40A, § 6, several building projects on the

---

[8]In 1986, the Newton planning division began consideration of amendments to the zoning ordinance for Dover users. At that time, BC was challenging in the Land Court the city's site plan review provisions as applied to its Putnam House project, which were invalidated by that court in August, 1987. In December, 1987, the city adopted the provisions in Table 2, which were intended to fill a gap left by the Land Court decision. The board's zoning amendment committee recognized that BC was a "unique exception" to the FAR requirement because the entire Middle Campus became nonconforming.

Middle Campus after adopting the FAR regulation in 1987, leading her to conclude that the board in effect had determined that additional development in that area reasonably could be accommodated. Moreover, she found that BC had demonstrated a "pressing need" to replace "outdated and cramped" facilities while the board failed to demonstrate that applying the FAR requirement to the Middle Campus generally would result in an appreciable advancement of Newton's legitimate zoning concerns.[9]

Because the FAR regulation prohibits any development on the Middle Campus without a special permit upon a § 6 finding, the judge properly concluded that the regulation, as applied to the Middle Campus generally, is invalid under the Dover Amendment. See *The Bible Speaks* v. *Board of Appeals of Lenox*, 8 Mass. App. Ct. at 32-33. Strict application of the FAR regulation "would significantly impede an educational use, . . . without appreciably advancing municipal goals embodied in the local zoning law." *Campbell* v. *City Council of Lynn*, 415 Mass. at 778. "A local zoning law that improperly restricts an educational use by invalid means, such as by special permit process, may be challenged as invalid in all circumstances." *Trustees of Tufts College* v. *Medford*, 415 Mass. at 765.

b. *The FAR regulation as applied to the MCP.* The board complains that the judge failed to apply the FAR specifically to the MCP and, so, failed adequately to address the size of the MCP or its potential impact on the neighborhood. The board insists that the judge improperly considered the FAR and dimensional regulations separately. While the judge analyzed the FAR and dimensional regulations in considerable detail in separate sections, her conclusions demonstrate that she properly assessed the reasonableness of both the density and dimensional regulations by comprehensively viewing the MCP in the over-

---

[9]There is no merit to the board's contention that annulling the FAR regulation as applied to the Middle Campus somehow would destroy the city's efforts to achieve city-wide uniformity in zoning. "We reject the suggestion that only local zoning requirements drafted specifically for application to educational uses are reasonable within the scope of the Dover Amendment. Nothing in that statute mandates the adoption of local zoning laws which are tailored specifically to educational uses." *Trustees of Tufts College* v. *Medford*, 415 Mass. at 760.

all context of the Middle Campus and the surrounding neighborhood.[10]

c. *The height, story, and setback regulations as applied to the Middle Campus.* The judge considered dimensional regulations governing the height of buildings, the number of stories, and the setback of buildings as interdependent, and stated that, taken together, they generally require smaller and shorter buildings near the campus perimeter but allow larger or taller buildings nearer the Campus center. Given the number of buildings on the Middle Campus, their different sizes, their architectural styles, and their placement, the judge concluded that the regulations as to height, number of stories, setbacks, and open space do not prohibit all construction. In particular, she determined that BC did not demonstrate that it would be prohibited by the dimensional regulations from further developing its Gothic style architecture or from developing a quadrangle-centered campus. There is no indication that the regulations "facially discriminate against educational uses." *Trustees of Tufts College* v. *Medford, supra* at 765. Therefore, they are presumptively valid and may be applied generally to the Middle Campus. *Ibid.*

d. *The height, story, and setback requirements as applied to the MCP.* The judge annulled the dimensional regulations as applied to the MCP. "[F]acially neutral requirements cannot be applied to educational uses without further inquiry into the outcome produced by such an application." *Id.*

In light of BC's demonstrated need for more adequate space to house existing campus activities and serve its student body and the judge's finding that the MCP will provide little in the way of extra growing room, we think BC has demonstrated on this record that the dimensional regulations applicable as a whole to the MCP are unreasonable. Compliance with the dimensional regulations would "substantially diminish or detract from the usefulness of [the MCP], or impair the character of

---

[10]In a lengthy footnote, the board asserts it was error for the judge to disregard the O'Neill Student Center as an alternative to the MCP. Focus by the court on such an alternative would come too close to "pursuing its own notions of land use planning . . . ." *The Bible Speaks* v. *Board of Appeals of Lenox, supra* at 32.

[BC's] campus, without appreciably advancing the municipality's legitimate concerns." *Id.* at 759. We examine in somewhat closer detail the height and story requirements and then the setback requirements.

(i) *Height and story requirements.*[11] The MCP exceeds the thirty-six foot height limit established by the zoning ordinance by some twelve feet, measured from grade plane to the average height of the highest roof surface (excluding chimneys, vents, towers or spires, and the like). The MCP exceeds the three-story limit as well. Several other Middle Campus buildings along College Road and Beacon Street also exceed these limits.[12] The judge found that strict application of the height and story requirements would prohibit BC from using a Gothic architectural style. In order to construct a building that would meet BC's need for space and satisfy the height requirement at the same time, BC would have to construct a building with a much larger footprint and a flat roof. Such a design would use more of the Campus Green's open space and would also create unsightly exposure of the building's mechanical equipment which, for aesthetic reasons, BC proposed to hide under a false pitched roof of Gothic style. Such considerations were proper. "[M]atters of aesthetic and architectural beauty are among the factors to be considered in deciding whether a zoning requirement 'impairs the character' of a proposed exempt use." *Martin v. The Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 434 Mass. 141, 152 (2001), quoting from *Trustees of Tufts College v. Medford, supra* at 757, 759 & n.6. See *Petrucci v. Board of Appeals of Westwood*, 45 Mass. App. Ct. 818, 826-827 (1998).

In evaluating whether BC demonstrated that requiring it to reduce the height of the MCP would not advance legitimate municipal concerns, the judge found the evidence inconclusive respecting the greater length of shadows the MCP might cast

---

[11]The judge stated that the board did not distinguish a separate purpose for the regulation on the number of stories from the height regulation. Therefore, she analyzed the height regulation as subsuming the story regulation.

[12]Along College Road, in addition to McElroy Commons, two other buildings (Lyons Hall and Bapst Library, 60.9 and 59 feet high, respectively) exceed the height limitation. Along Beacon Street, five buildings, ranging in height from forty-nine to seventy feet, also exceed the height limit.

across College Road versus the shadows that a building that complies with the height requirement might cast. She also found inconclusive the testimony on what effect either the proposed forty-eight foot height of the MCP or a smaller building complying with the thirty-six foot requirement would have on views of the Middle Campus by College Road neighborhood residents. Based on her own views of the site, the judge thought there would be relatively little difference. Moreover, if the MCP were only thirty-six feet in height and thus in compliance with the height requirement, it would still block the view from College Road toward the Middle Campus and perhaps "wall off" the Middle Campus from Beacon Street as well.[13]

(ii) *Setback regulations.*[14] The proposed MCP would be required under the setback regulations to be no closer than sixty feet from lines along College Road and Beacon Street, measured to the closest point of the buildings. The judge found that point from both College Road and Beacon Street to be forty-one feet. Both sides of the MCP, however, have "stepped" facades such that the actual setbacks along each street are greater then forty-one feet for significant lengths of each proposed building. McElroy Commons, which presently occupies the site, is rectangular in shape, with a corner of its shorter side set just seventeen feet back from College Road, and its longer side, which runs parallel to Beacon Street for about 300 feet, set back only twenty-five feet from that street. The MCP, in contrast, is

---

[13]The judge described the topography along College Road as significantly mitigating the impact of the MCP on views of open space and its height in relation to the surroundings. The land directly across College Road from the MCP slopes gradually upward so that the foundations of houses opposite building A are several feet above street level and the houses facing the MCP from the eastern side of Mayflower Road are on land at least sixteen feet above street level. The MCP is to be constructed on land below street level. Because of the setback of building B, a large grassy area will be maintained, extending 125 feet at its greatest depth from College Road. While the entrance to building C will be at a higher level than College Road, that entrance faces the intersection of Beacon Street, College Road, and Hammond Streets and does not affect views from residential areas.

[14]A 150-foot "vegetative buffer" is required in connection with certain setback provisions in Table 2. The board conceded at trial that this buffer could not reasonably be applied to the MCP. The judge also ruled the buffer regulation unreasonable under the Dover Amendment as applied generally to the Middle Campus. The board advances no argument on this issue.

Trustees of Boston College *v.* Board of Aldermen of Newton.

oriented with its greater length and bulk lying along College Road in an open area along that road where currently there is only a parking area. This proposed orientation of the MCP would replace McElroy Commons' twenty-five foot setback along Beacon Street with an average setback from Beacon Street of approximately fifty-six feet, running about the same 300-foot distance, thus substantially reducing the present setback nonconformity.

So placed, the MCP would have an average setback along College Road of 76.6 feet, compared with an average setback of only thirty-one feet for three existing buildings on that same side of College Road. Three other buildings along Beacon Street have an average setback of only twenty-six feet. The sixty foot setback requirement exceeds the setbacks of the nearest neighboring buildings, and its strict enforcement would require BC to significantly downsize the MCP. For these reasons, the judge correctly determined the regulation is unreasonable, particularly given the ordinance's "setback averaging provision" in section 30-15(d) of the Newton zoning ordinance, which the board did not apply to the MCP.[15]

5. *The parking requirements.* BC applied for a special permit requesting a waiver from the parking regulations and, in support, submitted a site plan to the city planning department with information on the likely effect the MCP would have on existing and proposed parking spaces. The planning department took the view that simultaneous use of the various facilities of the

---

[15]Section 30-15(d) provides in relevant part that "[n]o building need be set back more than the average of the setbacks of the buildings on the lots nearest thereto on either side . . . ." The board did not apply this averaging provision because it treats each Middle Campus zoning district as a single lot. In applying the sixty-foot setback specified in Table 2, the board thus ignored the actual presence of adjacent buildings having setbacks significantly less than sixty feet on the theory that these buildings are not located on other "lots nearest [to Middle Campus] on either side." There is no merit to the board's argument that deference should be given its interpretation of its own regulation and that Table 2 supersedes other provisions, including the setback averaging provisions of section 30-15(d). The judge's application of the setback averaging provision properly sought to construe the zoning ordinance "in a manner which sustains its validity." *Doliner* v. *Town Clerk of Millis,* 343 Mass. 10, 15 (1961).

MCP and other BC facilities during individual trips there in the course of a typical day is not taken into account by the parking regulations, which simply aggregate parking space requirements according to specific separate uses listed in the ordinance. That view was supported by trial evidence. The judge concluded that application of the regulations, as written, results in an over-counting of required parking spaces. In fact, 357 new spaces would be required if the regulations were strictly and literally applied.[16]

The provisions of section 30-19(d)(13) (see note 16, *supra*) do allow the number of required spaces to be discounted to ac-count for simultaneous uses of facilities such as food service establishments, theatres, halls, places of assembly in conjunc-tion with a "hotel or motor hotel" located in the same or an abutting building. But there is no analogous provision that al-lows for the number of required parking spaces to be reduced or discounted where a dormitory is located nearby. The board urges that applying the hotel/motor hotel discounting provision would reduce the number of required spaces from 357 to eighty-nine, thus suggesting that the parking requirements, as applied to the MCP, are not unreasonable. In passing on the validity of the parking requirements, the judge refused to apply the hotel discounting provision, stating that, on its face, an exemption for hotels does not apply to a different provision for college

---

[16]The parking regulations, entitled "Parking and loading facility require-ments," appear in Newton zoning ordinance section 30-19, which is divided into twenty separate use categories, including one category applicable to a dormitory, but no single category applicable generally to the multiple activi-ties that typically occur on college campuses such as Middle Campus.

Examples of multiple uses include persons who use dining facilities may also use classrooms and meeting rooms; a parking space is required for each five dormitory beds, and for each three classroom seats, but no provision is made in cases where the same individual occupies a bed, a classroom seat, or a dining hall seat.

The judge stated that the "Planning Department apparently recognized the deficiencies in applying the parking requirements to a college campus when it applied the last sentence of [section] 30-19(d)(13) in calculating the parking requirements for the MCP. Based on the evidence at trial, properly applied to the MCP or other Middle Campus proposals, the provisions contained in this sentence might cure the parking regulations of their present infirmity, as ap-plied to [BC]."

dormitories.[17] Accordingly, the judge properly concluded that, as written, the regulations requiring 357 new spaces are unreasonable under the Dover Amendment when applied to the MCP and the Middle Campus.

Construction of the MCP would result in the removal of three surface parking lots containing a total of 109 spaces, but BC proposes to replace those with seventy-two new spaces underground in the MCP and thirty-eight more spaces by re-striping three other surface lots. Thus, the MCP essentially maintains the status quo, and BC sought a special permit exempting the MCP from the parking regulations on that basis. While quantifying the need, if any, for additional parking in this case is problematic in view of the result of over-counting when the regulations are strictly applied, the evidence nonetheless indicates that the MCP may indeed require additional parking beyond what is now available.

The MCP will include additional new venue space, affording BC the opportunity to host lectures, seminars, and other community events that may attract people not already on campus who may travel there by car and need parking. As found by the judge, the MCP will generate approximately 790 additional vehicle trips daily to and from the BC campus, including the Middle Campus.

BC presented evidence from its traffic expert that when the MCP was proposed in 1996, the Middle Campus had a surplus of fifty or so parking spaces at peak time (1:00 P.M.) based on an estimated duration of stay (the time a car stays in a parking space) of 1.9 hours. The traffic expert concluded in his study that this surplus would adequately absorb any extra demand for parking spaces that the MCP might generate. The city planning department agreed with this and endorsed BC's proposal that no new spaces be provided.

The judge credited the expert's conclusions in part and rejected them in part. She found the 1.9 hour duration of stay estimate to be speculative and based on too small a sample of

---

[17]Parking requirements for the two are different. Hotels or motor hotels require one space for each guest room, plus one space for every three employees on the largest shift. Dormitories require only one space for every five dorm residents (and no additional spaces for employees or staff).

campus parking lots. More important, she inferred from the evidence that the MCP will create a "more attractive and comfortable place to spend time and interact with . . . members of the [BC] community" and, thus, that parking spaces in fact may not turn over as expected on an average of every 1.9 hours. From this, she concluded that the projected surplus of parking spaces could "quickly turn into a deficit." On this reasoning, she remanded to the board the issue of determining what, if any, number of additional parking spaces might reasonably be required by the MCP while upholding as reasonable the board's denial of a special permit totally exempting the MCP from the parking regulations.

"[W]hen the judge's conclusions are based on reasonable inferences from the evidence and are consistent with the findings, there is usually no error." *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 510 (1997). Thus, we do not find error in the judge's conclusion that an unspecified number of additional parking spaces possibly may be required for the MCP; hence the need to remand that question for the board's determination. Among BC's stated purposes in proposing to construct the MCP in the first place is to improve and expand overcrowded, inadequate facilities in McElroy Commons and elsewhere across the Middle Campus. In fact, the proposed, improved dining facilities slated for the buildings that are to replace McElroy Commons will encourage the estimated 1,000 or more people who currently leave campus to eat lunch elsewhere to remain on campus instead. This is approximately at the 1:00 P.M. peak time on Middle Campus when, according to BC's traffic expert, the demand is highest for parking. This alone could generate a need for more parking spaces than are currently available.

To the degree reasonably possible, the Dover Amendment seeks to accommodate protected uses with critical municipal concerns, which include provision of adequate parking. *Trustees of Tufts College* v. *Medford, supra* at 760. Further, there is no requirement that, to be enforceable, zoning regulations (including the parking regulations here) must be "tailored specifically for educational uses." *Ibid.* Although we agree that the judge correctly held invalid under the Dover Amendment the parking

regulations as they were strictly applied to the MCP to require up to 357 additional spaces (without benefit of the hotel discounting provision), we cannot at the same time say that reasonable accommodation on parking cannot be had under those regulations. We should attempt to give a local zoning requirement validity "if that can be done without straining the common meaning of the terms employed." *Id.* at 761, citing *Doliner* v. *Town Clerk of Millis*, 343 Mass. 10, 15 (1963).

Thus, on remand, the board and BC may wish to fashion some kind of reasonable accommodation on parking (if any additional parking be required in the first place).[18]

6. *Conclusion.* We state our conclusions with respect to the Land Court's eight-paragraph judgment as follows: (1) we affirm the judgment that the FAR requirements (and the 150-foot vegetative buffer requirement, which was not an issue on appeal) cannot be applied to the Middle Campus generally, or applied so as to require BC to seek the required finding for a special permit; (2) we affirm the judgment that the dimensional regulations in Table 2 and the procedures in sections 30-21(b) and 30-24 of the zoning ordinance may be applied to the Middle Campus generally; (3) we affirm the judgment that the sixty-foot setback, the alternative setback requirement in footnote 1 of the setback table, and the thirty-six foot maximum height and three stories requirements may not be applied specifically to the MCP, or applied separately or together so as to require a special permit; (4) we affirm the judgment annulling the denial of the special permit to reconstruct McElroy Commons; (5) we affirm the judgment that the parking regulations in section 30-19 may not be applied generally to the Middle Campus or specifically to the MCP; (6) we affirm the judgment upholding the denial of a special permit for relief from section 30-19 of the parking regulations; and (7) we affirm the judgment remanding to the board the question of determining the number of parking spaces required for the MCP.[19]

*So ordered.*

---

[18]For example, the parties might agree to an accommodation similar to the hotel/motor hotel discounting provision.

[19]Nothing in our decision affects the requirements of applicable State or local codes such as health, sanitary, and fire codes and regulations, and the State

Trustees of Boston College *v.* Board of Aldermen of Newton.

APPENDIX A.

Building Code. Compare *The Bible Speaks* v. *Board of Appeals of Lenox*, 8 Mass. App. Ct. at 35 n.15. Nor shall BC be required to seek a special permit as a condition precedent to obtaining a building permit. Compare *id.* at 34.

Trustees of Boston College *v.* Board of Aldermen of Newton.

APPENDIX B.

|  | Single Residence 1 District Regulations | Multi-Residence 1 District Regulations |
|---|---|---|
| Lot area | 50,000 sq. ft. | 20,000 sq. ft. |
| Front Set Back[1-2] | 60 ft. | 40 ft. |
| Side Set Back[1-2] | 40 ft. | 30 ft. |
| Rear Set Back[1-2] | 40 ft. | 30 ft. |
| Total Floor Area Ratio[3] | .2 | .5 |
| Building Height[4] | 36 ft. | 36 ft. |
| Maximum Number of Stories | 3 | 3 |
| Maximum Building Lot Coverage | 30% | 30% |
| Minimum Amount of Open Space | 30% | 30% |

[1] Or (Building Height + Building Length + Building Width) ÷ 3, whichever is greater.

[2] In Single Residence 1 Districts where a Multi-Use Institution and dormitories with more than 3 acres of land abut single residence uses or are separated from such uses by an adjacent street, a 60 foot vegetative buffer must be maintained from all property lines of the institutional use and for those exceeding 10 acres of land, said vegetative buffer must be a minimum of 100 feet, and for those exceeding 20 acres of land, said vegetative buffer must be a minimum of 150 feet.

[3] FAR may be increased by .1 for each additional 10% of the lot area that is devoted to usable open space up to a maximum FAR of 1.0.

[4] Building height may be increased by one story for every 150 feet of distance from streets and/or abutting properties but not to exceed 6 stories or 60 feet. Building Height regulates buildings and structures.