MAUREEN SHEEHAN, trustee,[1] vs. ZONING BOARD OF APPEALS
OF PLYMOUTH & another.[2]

No. 04-P-1032.

Plymouth. June 6, 2005. - November 3, 2005.

Present: ARMSTRONG, C.J., PERRETTA, & LENK, JJ.

*Zoning,* Person aggrieved, Appeal, Special permit, Parking, Littoral property. *Statute,* Construction. *Practice, Civil,* Costs.

In a zoning case, the judge did not err in concluding that the plaintiff trust had standing as an "aggrieved party" under G. L. c. 40A, § 17, to challenge the grant of a special permit authorizing the construction of a condominium complex on a site near the trust property, based on the potential impact of the construction on the trust property's environmental, harbor view, and conservation interests protected under the local zoning bylaws. [54-55]

A Superior Court judge made adequate findings of fact to support his conclusions that a proposed condominium development met certain tree preservation and parking requirements necessary for the grant of a special permit by the local zoning board of appeals [55-59], and the judge did not err in concluding that the development did not violate provisions in the local zoning bylaws concerning public access to the shoreline [59-61].

A Superior Court judge erred in concluding that a plaintiff acted in bad faith in challenging the decision of a local zoning board of appeals to grant a special permit to a condominium developer, where nothing in the evidence indicated that the plaintiff had been improperly motivated in bringing the action. [61-62]

CIVIL ACTION commenced in the Superior Court Department on January 4, 2002.

The case was heard by *Charles J. Hely,* J.

*Robert E. McDonnell* for the plaintiff.

*Brian K. Bowen* for Gladstone Development Corporation.

ARMSTRONG, C.J. The zoning board of appeals of Plymouth (board) granted Gladstone Development Corporation (Glad-

[1]Of Eight Mates Trust.
[2]Gladstone Development Corporation.

stone) a special permit to build a condominium complex on a site bordering Plymouth harbor. The plaintiff Sheehan, as trustee of Eight Mates Trust, a neighboring property owner, appealed the grant of the permit under G. L. c. 40A, § 17. The judge affirmed the board's decision, further concluding that Sheehan brought her action in bad faith. He awarded Gladstone legal but not actual costs[3] incurred in defending the action. The case is before us on Sheehan's appeal from the judgment and on Gladstone's cross-appeal challenging the judge's refusal to award actual costs and attorney's fees based on the finding of bad faith.

The Gladstone site is located within Plymouth's waterfront zoning district. Plymouth Harbor forms the site's northern border. Other boundaries are an abandoned railroad track to the south; Hedge Road, a public way, to the west; and private residences to the east. The site consists of approximately eleven acres, and its prominent features are a three-acre pond on its northwestern portion and a wooded hill on its southeastern portion. Gladstone proposes to build a forty-two-unit, nine-building condominium complex. Eight buildings located on the hill will house sixteen two-bedroom units and twenty-six three-bedroom units. The final building, a clubhouse located by the pond, will include an outdoor swimming pool, showers, bathrooms, and pool maintenance equipment. The project will also include parking, walking trails, stairs and trails to the beach, and a gazebo overlooking the pond. The board found, and Sheehan does not appear to dispute, that the proposed design is "of high standards."[4]

The Sheehan, or Eight Mates Trust, property consists of several contiguous parcels of land along the western side of Hedge Road and the southerly side of the railroad track. The land is largely undeveloped with the exception of some com-

---

[3]Legal costs were fees for service of process, witness attendance fees at the statutory rates, and reasonable deposition fees. See *Waldman* v. *American Honda Motor Co.*, 413 Mass. 320, 322-324, 326-328 & n.13 (1992).

[4]In consequence of this finding, the board, as an alternative to its finding that the project met all applicable environmental design conditions of the bylaw, exercised its discretion under § 205.03(F) of the bylaw to waive or modify those conditions to the extent they were not otherwise met. We do not reach this alternative basis for decision.

mercial buildings. Unlike the Gladstone property, the Sheehan property lacks harbor frontage.

Sheehan raises several issues on appeal. First, she argues that the trial court erred in its conclusion that the development met the tree preservation and parking requirements necessary for a grant of a special permit. Second, she argues that the development violates provisions in Plymouth's zoning bylaw concerning public access to the shoreline. Finally, she argues that the judge erred in finding that she brought her action in bad faith. On cross appeal, Gladstone argues that Sheehan lacked standing to challenge the board's decision and that the judge erroneously limited the bad faith damages to service of process, witness attendance, and deposition fees.

1. *Standing.* General Laws c. 40A, § 17, allows "[a]ny person aggrieved" by a decision of a board of appeals to challenge the decision in Superior Court. At least one of the Eight Mates Trust lots abuts an abutter within 300 feet of the Gladstone site; under G. L. c. 40A, § 11, this creates a rebuttable presumption that Sheehan as trustee is a person aggrieved. See *Marashlian* v. *Zoning Bd. of Appeals of Newburyport,* 421 Mass. 719, 721 (1996). Once a defendant offers evidence to rebut the presumption, as Gladstone did, the presumption ends and the judge is required to decide the issue of the plaintiff's standing on the basis of all the evidence. See *Bedford* v. *Trustees of Boston Univ.,* 25 Mass. App. Ct. 372, 376 (1988).

To survive a challenge to standing, the plaintiff must "demonstrate, not merely speculate, that there has been some infringement of his legal rights." *Denneny* v. *Zoning Bd. of Appeals of Seekonk,* 59 Mass. App. Ct. 208, 211 (2003). We do not read the term "person aggrieved" narrowly, but the claimed injury or loss must be "personal to the plaintiff, not merely reflective of the concerns of the community." *Ibid.* See *Barvenik* v. *Aldermen of Newton,* 33 Mass. App. Ct. 129, 132 (1992) (injury must be "special and different from the concerns of the rest of the community").

Whether an individual is aggrieved is a question of fact for the trial judge, *Marashlian* v. *Zoning Bd. of Appeals of Newburyport,* 421 Mass. at 721, which should not be reversed unless clearly erroneous. *Paulding* v. *Bruins,* 18 Mass. App. Ct.

707, 709 (1984). The judge concluded that the trust property would lose some of its limited harbor view and the environmental and aesthetic benefits of a nearby wooded hill. Both factors would be an asset in selling or developing the trust property for residential purposes, sufficient grounds for standing based on the judge's reading of *Tsagronis* v. *Board of Appeals of Wareham*, 415 Mass. 329, 330 n.4 (1993). The judge also found that the trust property had protected environmental, harbor view, and conservation interests under "various provisions of the Plymouth Zoning Bylaw." See *Monks* v. *Zoning Bd. of Appeals of Plymouth*, 37 Mass. App. Ct. 685, 688 (1994).[5]

"Generally, concerns about the visual impact of a structure do not suffice to confer standing," *Martin* v. *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 434 Mass. 141, 146 (2001), and we do not read the *Tsagronis* case to confer standing on a property owner who claims that development will obstruct a water view. See *Tsagronis*, 415 Mass. at 335 (Abrams, J., dissenting), quoting from *Nigro* v. *Jones*, 332 Mass. 741, 744 (1955) (arguing that "a substantial deprivation of light, enough to render the occupation of the house uncomfortable according to the ordinary notions of mankind," is necessary for standing). See also *Denneny* v. *Zoning Bd. of Appeals of Seekonk*, 59 Mass. App. Ct. at 216 & n.10. Sheehan's concern with the visual impact of development on a nearby wooded hill strikes us as the type of aesthetic sensibility insufficient to impart standing, as we discussed in *Harvard Square Defense Fund, Inc.* v. *Planning Bd. of Cambridge*, 27 Mass. App. Ct. 491, 493 (1989). See *Monks* v. *Zoning Bd. of Appeals of Plymouth*, 37 Mass. App. Ct. at 688. However, the judge's conclusion that the bylaw created additional protected environmental, harbor view, and conservation interests sufficient to provide Sheehan with standing was, as in the *Monks* case, *supra*, not clearly erroneous. Moreover, the judge had the benefit of a view, which put him in a better position than us to judge the potential impact of the Gladstone clubhouse on the trust property. The judge's finding that Sheehan has standing is not clearly erroneous.

2. *Special permit conditions.* In granting a special permit, the

---

[5]The judge's opinion did not address other asserted bases for standing, such as increased congestion.

board must set forth the reasons for its decision that proposed development meets the applicable statutory and bylaw standards, *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 295 (1972), including affirmative findings as to the existence of each condition required for the granting of the special permit. *Vazza Properties, Inc.* v. *City Council of Woburn*, 1 Mass. App. Ct. 308, 311 (1973). The Superior Court judge is required to hear the matter de novo and must independently find that each statutory or bylaw condition is met. *Ibid.*

Under § 401.09(C)(5) of the Plymouth zoning bylaw, a special permit is required for the construction of residences in a waterfront zone. In addition to the general requirements applicable to all special permit uses, waterfront special permit uses are subject to a series of "environmental design conditions." Sheehan concentrates on the bylaw conditions regarding parking and tree preservation.

a. *Parking.* Sheehan first argues that the board and the trial judge failed to make adequate findings that Gladstone's proposed development satisfied the off-street parking conditions contained in §§ 305.01 and 305.11 of the bylaw. The board determined that 109 parking spaces were required under the bylaw and that the requirement was satisfied by the 115 spaces provided for in the Gladstone development plans. These numbers reflect an accurate application of the formula set out in § 305.11 for multifamily dwellings,[6] and constitute the necessary affirmative finding. Compare *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. at 299 (findings inadequate where they did not reflect specific application of mathematical formulae as required by pertinent bylaw provisions); *Howland* v. *Board of Appeals of Plymouth*, 13 Mass. App. Ct. 520, 523 (1982) (same). The Superior Court judge made identical calculations. Sheehan argues that the bylaw required the board to treat the clubhouse, which is for the exclusive use of the residents, as an independent use with additional parking needs. As we observed in another

---

[6]The bylaw requires two spaces per two-bedroom unit and 2.6 spaces per three-bedroom unit. The source of a requirement for one additional parking space per five units does not appear in the copy of the zoning bylaw included in the record. Nothing in our decision turns on this omission, as all parties agree that the requirement exists and is included in the total of 109 spaces.

case, logic suggests otherwise. See *Trustees of Boston College v. Aldermen of Newton*, 58 Mass. App. Ct. 794, 807 & n.16 (2003) (simply aggregating parking requirements for different uses on site would result in "overcounting" of required parking spaces when, for example, "the same individual occupies a bed, a classroom seat, or a dining hall seat").

Sheehan argues that § 305.01 of the bylaw, which requires special permit uses to provide parking on the same lot as the principal use served, or else parking on other properties within 400 feet of the principal building,[7] bars the board from counting sixteen spaces located at the clubhouse (which is more than 400 feet from the nearest residence) towards the required 109 parking spaces. The bylaw is phrased disjunctively; it does not forbid inclusion of such on-site parking spaces in calculating the total,[8] and given that its dominant purpose is to locate parking on-site, see *Howland* v. *Board of Appeals of Plymouth*, 13 Mass. App. Ct. at 522-523, we should not imply such a restriction. The board and the Superior Court judge made adequate findings that the parking requirements of the bylaw were met. See *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. at 295.

b. *Tree preservation.* Gladstone's detailed "planting plan" located in the record appendix refutes Sheehan's first argument that Gladstone did not submit a site plan detailing "natural trees and foliage to be maintained" and "specific new planting by size and location" as required by § 205.03(C)(4) of the bylaw.

Sheehan argues that the board and the judge failed to make adequate findings that the Gladstone development satisfied two

---

[7]Section 305.01 provides:

"Off-Street parking spaces and necessary maneuvering space shall be required in all districts according to the ratios established under Section 305.11 below. Required parking spaces be [*sic*] on the same lot as the principal use served, or if not reasonably possible, on other property in the same district within 400 feet of the principal building."

[8]Sheehan argues that the 400-foot requirement of § 305.01 applies because the Gladstone development is composed of several lots. Adjoining lots in common ownership are normally treated as a single lot for zoning purposes, *Seltzer* v. *Board of Appeals of Orleans*, 24 Mass. App. Ct. 521, 522 (1987), and we see no reason here to deviate from the general rule.

sections of the by-law: section 205.03(D)(1), which limits tree clearance to an "absolute practical minimum," and § 301.05, which provides that lots covered by mature trees of greater than five inches in breast-height diameter should not be thinned by more than fifty percent, and that all such trees lying outside of areas of actual construction should be preserved.

The board made four findings addressing tree coverage: first, the upland portion of the Gladstone development is "thickly wooded"; second, "some tree removal" would occur on that portion of the site; third, the removal would be compensated for by the proposed landscaping plan; and finally, retaining walls would be used to preserve existing vegetation. The judge, who took a view of the site, made additional findings: first, that the clearing of trees would be limited to the minimum necessary for construction, access, and reasonable open space; second, that the fifty-percent thinning requirement did not apply because the site was not covered with mature trees more than five inches in breast-height diameter; and finally, that trees exceeding that diameter located outside of the areas of actual construction activity would be preserved.

The judge's findings amply satisfied the requirement that he independently find that the special permit condition regarding tree preservation had been met. See *Vazza Properties, Inc.*, v. *City Council of Woburn*, 1 Mass. App. Ct. at 311. Findings from the board that more directly addressed §§ 205.03(D)(1) and 301.05 would have been preferable. However, certain findings — that the landscaping plan adequately compensated for any tree clearance caused by construction and that the proposed retaining walls would preserve natural vegetation reflected the board's concern for the bylaw conditions — implied that the conditions were met, and supported the ultimate decision to grant the special permit. See *Shoppers' World, Inc.* v. *Beacon Terrace Realty, Inc.*, 353 Mass. 63, 67 (1967) (board must set forth substantial facts that "rightly can move an impartial mind, acting judicially, to the definite conclusion reached"), quoting from *Prusik* v. *Board of Appeal of Boston*, 262 Mass. 451, 457-458 (1928). Compare *Pierce* v. *Board of Appeals of Carver*, 2 Mass. App. Ct. 5, 6 (1974) (invalidating grant of special permit when board neither found nor implied that bylaw condition

had been met). The board "avoided the common vice of parroting the statutory standards for a grant of a special permit in lieu of findings." *Campbell* v. *City Council of Lynn*, 32 Mass. App. Ct. 152, 159 (1992), quoting from *Tebo* v. *Board of Appeals of Shrewsbury*, 22 Mass. App. Ct. 618, 622 (1986).

3. *Shoreline access.* Section 401.09(C)(5) of the zoning bylaw provides that multifamily and single-family attached residential construction in waterfront districts is to be "designed not to preclude public access to and along the shoreline." The parties direct us to no Massachusetts case that addresses the degree of public access necessary to satisfy such a provision.[9] In the context of a development of relatively small compass, we do not read the phrase "not to preclude" as requiring affirmative measures to expand traditional public shoreline rights such as the dedication of an easement. Compare those portions of town bylaws explicitly contemplating the dedication of an easement in *Patel* v. *Planning Bd. of N. Andover*, 27 Mass. App. Ct. 477, 478 (1989), and *Sullivan* v. *Planning Bd. of Acton*, 38 Mass. App. Ct. 918, 920-921 (1995).

"Preclude" is commonly defined as "to make impossible by

[9]Two States, Washington and California, have statutes that address public access as part of the coastal development permit process. Washington's Shoreline Management Act provides, in its relevant part: "Permitted uses in the shorelines of the state shall be designed and conducted in a manner to minimize . . . any interference with the public's use of the water." Wash. Rev. Code § 90.58.020 (2004). Judicial interpretation has rendered the statute relatively toothless; a private yacht club's construction of private dock facilities for its members satisfied this provision because the facility would free up public moorage spaces currently being used by club members, provide pump-out services to the public, and increase shoreline access for its own members, who were also members of the public. See *Jefferson County* v. *Seattle Yacht Club*, 73 Wash. App. 576, 590 (1994). See also *Eastlake Community Council* v. *City of Seattle*, 64 Wash. App. 273, 277 (1992), citing *Department of Ecology* v. *Ballard Elks Lodge No. 827*, 84 Wash. 2d 551, 559 (1974), for the proposition that a private facility that increased shoreline access for its private members satisfied the public access provisions of the statute.

In contrast, section 30212 of the California Coastal Act requires new development projects to provide public access "to the shoreline and along the coast" from the nearest public roadway. Cal. Pub. Res. Code § 30212 (West 1996). The provision is routinely used to exact permanent easements for public access to the shoreline. See, e.g., *Georgia-Pacific Corp.* v. *California Coastal Commn.*, 132 Cal. App. 3d 678, 699 (1982).

necessary consequence." Merriam-Webster's Collegiate Dictionary 977 (11th ed. 2003). The judge credited the testimony of Gladstone employees that the project will not erect barriers to impede the public's traditional rights to the area between the high and low water marks for "fishing, fowling and navigation," see *Opinion of the Justices*, 365 Mass. 681, 685 (1974), and the record indicates that the development will take some affirmative steps to increase shoreline access, such as building stairways to the beach and creating "visual corridors" across the site to the bay. The impossibility of public shoreline access is not a necessary consequence of the Gladstone development. Gladstone is not proposing a gated community designed to preclude public access in violation of the bylaw. Gladstone has done as much as the bylaw requires.

Sheehan next points to § 401.09(E)(2), a paragraph that states that waterfront uses "should be designed to allow pedestrian access to and along the shore for a minimum distance of ten (10) feet inland from the mean high water mark." As to access along the shore, nothing Gladstone proposes blocks such lateral access. As to access "to" the shore, i.e., across the Gladstone property, we again do not read into the bylaw a mandate that the board exact the dedication of a route of public access as a condition of granting a special permit. In contrast to the mandatory ("shall") phraseology of the next following paragraph of the section (§ 401.09[E][3][10]), this paragraph indicates a recommended ("should"), rather than a required, course of action. See *Uglietta* v. *City Clerk of Somerville*, 32 Mass. App. Ct. 742, 744-745 (1992), quoting from 2A Sands, Sutherland Statutory Construction § 57.11 (4th ed. 1984) ("Where both mandatory and directory verbs are used in the same statute . . . it is a fair inference that the legislature realized the difference in meaning, and intended that the verbs used should carry with them their ordinary meanings"). See also *United States* v. *Maria*, 186 F.3d 65, 70 (2d Cir. 1999); *Qwest Corp.* v. *Federal Communications Commn.*, 258 F.3d 1191, 1200 (10th Cir. 2001) (where "shall" and "should" appear in the same section, "should" indicates a recommended course of action); *State* v. *Garrett*, 80 Wash. App.

---

[10]Section 401.09(E)(3) provides: "Minimum setback of major structures from mean high water mark shall be twenty-five (25) feet, unless the wetlands designation and regulations of Section 401.02 apply."

651, 652 (1996) (same). Moreover, the phraseology of the bylaw paragraph, "minimum distance of ten (10) feet inland from the mean high water mark," indicates that the bylaw is directed to preserving the beach bordering the mean high water mark, not the provision of access routes across private property to the beach.

4. *Bad faith.* General Laws c. 40A, § 17, inserted by St. 1975, c. 808, § 3, provides that a court may assess costs against a party appealing a grant of a special permit if it appears that the appellant "acted in bad faith or with malice in making the appeal to the court."[11] Prior to the initiation of this suit, Sheehan's husband, who the judge found was clothed with apparent authority to speak for the trust, discussed with Gladstone the possibility of the Sheehans either selling the trust lots to Gladstone or obtaining a right of way to the shoreline from Gladstone and developing the lots itself. Nothing came of the discussions. The judge concluded that the Sheehan complaint was a bad-faith attempt to use the leverage of the lawsuit to "unfairly extract an economic advantage or a right of way concession from Gladstone and to block or drive up the costs of a project that might compete with development on the Eight Mates parcel." We reverse that portion of the judge's decision.

Generally, bad faith actions are those "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." *Hahn* v. *Planning Bd. of Stoughton,* 403 Mass. 332, 337 (1988), quoting from Fed.R.Civ.P. 11 (1987). That a property owner looks first to sell his interest and then to protect it by way of a lawsuit is unexceptional; the temporal sequence alone does not evince bad faith. Nothing in the evidence indicates that Sheehan filed suit to harass Gladstone or to drive up its costs, as contrasted, for example, with the effort to secure for the benefit of the trust property a public use easement to the shore, which Sheehan could reasonably argue was the mandate of the bylaw. Contrast *Pirie* v. *First Congregational Church,* 43 Mass. App. Ct. 908, 911 (1997), where the plaintiff's bad faith motivation was

---

[11]Unlike G. L. c. 231, § 6F, which is the general statute for awarding costs to bad-faith litigants, G. L. c. 40A, § 17, does not require additional findings that the claim was wholly insubstantial and frivolous.

evinced by statements such as: "You will probably ultimately get to do what you want, but I'm warning you, I will take you through every legal process and deplete your resources in the process. Then you won't be able to afford what you want to do." Nor, at this point, have the Sheehans engaged in the type of extensive, baseless legal maneuvering that is intended solely to cause delay. See, e.g., *Pollack* v. *Kelly*, 372 Mass. 469, 477 & n.5 (1977) (repeated, premature appeals); *Hahn* v. *Planning Bd. of Stoughton*, 403 Mass. at 334, 337 (multiple actions and appeals at each stage of case); *Ashford* v. *Massachusetts Bay Transp. Authy.*, 421 Mass. 563, 568-569 (1995) (improper appeals). Absent evidence of improper motives, the finding of bad faith cannot stand.

So much of the judgment as awards costs to Gladstone on the basis of bad faith by the plaintiff is reversed. The judgment is otherwise affirmed.

*So ordered.*